SAVE THE BAY, INC., Petitioner,

v.

ADMINISTRATOR OF the ENVIRON-
MENTAL PROTECTION
AGENCY, Respondent.

No. 75–1633.

United States Court of Appeals,
Fifth Circuit.

Aug. 5, 1977.

Rehearing and Rehearing En Banc
Denied Sept. 21, 1977.

Robert O. Homes, Jr., Metairie, La., for petitioner.

Russell E. Train, Administrator, E. P. A., Washington, D. C., Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Michael P. Carlton, Chief, Appellate Sec., Dept. of Justice, Land & Nat. Resources, Washington, D. C., for respondent.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

The 1972 amendments to the Federal Water Pollution Control Act joined the Environmental Protection Agency and the fifty states in a delicate partnership charged with controlling and eventually eliminating water pollution throughout the United States. The petition before us raises several questions concerning the role of the federal appellate and district courts in scrutinizing EPA's performance within this partnership.

The Mississippi Air and Water Pollution Control Commission is a member of this pollution battling alliance. In 1975 the Commission granted to E. I. DuPont de Nemours & Co. a permit to operate a titanium dioxide plant at Bay St. Louis, Mississippi. EPA acquiesced in this action by its partner; petitioner here challenges that acquiescence. Petitioner specifically claims, first, that the Commission so mishandled DuPont's permit application that the EPA should have revoked the Commission's authority to grant such permits. Second, petitioner would have this court review EPA's failure to block the DuPont permit.

EPA strenuously urges that this court is without jurisdiction to consider either of petitioner's contentions. We conclude that this court has both the authority and obligation to review EPA decisions to withdraw or not to withdraw a state's delegated permit authority. Certain preconditions to that review are here missing, however, and preclude our determination of the merits of petitioner's first claim. Second, we conclude that this court lacks jurisdiction to review EPA's failure to veto the permit. To the extent EPA's action in this regard is

reviewable, original jurisdiction must lie in the district courts. Accordingly, we dismiss the original petition filed in this court.

## I. Legislative and Factual Background

The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251–1376 (hereinafter "Amendments") substantially overhauled the nation's system of water quality control, declaring "the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985". § 101(a)(1), 33 U.S.C. § 1251(a)(1). Toward that end the Amendments introduced a system of "effluent limitations" on "point sources" of pollutants.[1] Formerly federal water pollution control efforts centered on standards of water quality specifying acceptable levels of pollution in interstate navigable waters. Through the shift in the 1972 Amendments to strict limitations applicable to each individual point of discharge, Congress intended to "facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated." *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 204, 96 S.Ct. 2022, 2024–25, 48 L.Ed.2d 528 (1976).[2]

To enforce the effluent limitations, the Amendments created the National Pollution Discharge Elimination System (NPDES), a scheme for issuing permits to individual dischargers of pollutants. *See* § 402, 33 U.S.C. § 1342. Without an NPDES permit, one may not lawfully discharge a pollutant. *See* § 301(a), 33 U.S.C. § 1311(a). Discharge in compliance with the terms of an

---

1. A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." § 502(14), 33 U.S.C. § 1362(14). An effluent limitation is "any restriction established by a state or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . ." § 502(11), 33 U.S.C. § 1362 (11). The Amendments base the effluent limitations on particular technologies. With the exception of publicly owned treatment works, point sources had to achieve effluent limitations requiring appli-

cation of the "best practicable control technology currently available" by June 1, 1977, and must achieve limitations requiring application of the "best available technology economically achievable" by June 1, 1983. §§ 301(b)(1)(A), 301(b)(2)(A), 33 U.S.C. §§ 1311(b)(1)(A), 1311(b)(2)(A).

2. *EPA v. California, supra,* contains a thorough description of the previous federal water quality legislation and the operation of the 1972 Amendments. We have drawn on that description in our discussion of the new scheme.

NPDES permit, on the other hand, is with few exceptions deemed compliance with the Amendments for enforcement purposes. *See* § 402(k), 33 U.S.C. § 1342(k). Thus the terms of individual NPDES permits provide the chief means of implementing the strict national standards mandated by the Amendments.

Congress vested this all-important permit issuing authority in EPA as an original matter. *See* § 402(a)(1), 33 U.S.C. § 1342(a)(1). In keeping with congressional desire "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution", Amendments § 101(b), 33 U.S.C. 1251(b), the 1972 legislation also offered states the opportunity to obtain permit issuing authority. Under § 402(b), 33 U.S.C. § 1342(b), a state may submit to EPA a proposed permit program governing discharges into navigable waters within its borders. The state must demonstrate that it will apply the effluent limitations and the Amendments' other requirements in the permits it grants and that it will monitor and enforce the terms of those permits.[3] Unless the Administrator of EPA determines that the proposed state program does not meet these requirements, he must approve the proposal.

Upon approval of a state program, EPA must suspend its own issuance of permits covering those navigable waters subject to the program. § 402(c)(1), 33 U.S.C. § 1342(c)(1). Although its role as issuer of NPDES permits thereupon ceases, the federal agency retains review authority and responsibility over an approved state program. The two aspects of this supervisory role form the subjects of the case at bar.

First, EPA may withdraw its approval of a state program upon determining, after notice and an opportunity to respond, that the program is not being administered in compliance with the requirements of § 402, 33 U.S.C. § 1342. *See* § 402(c)(3), 33 U.S.C.

§ 1342(c)(3). Second, EPA may veto individual permits issued under approved state programs. Section 402(d)(1), 33 U.S.C. § 1342(d)(1), requires a state to send EPA a copy of each permit application it receives and to notify EPA of every action related to the application, including any proposed permit. Section 402(d)(2)(B), 33 U.S.C. § 1342(d)(2)(B), provides that no permit shall issue

> if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter.

The Administrator may waive his right to object to any individual permit application. § 402(d)(3), 33 U.S.C. § 1342(d)(3). Additionally, at the time he approves a state program the administrator may waive as to any category of point sources the requirement that the state transmit proposed permit applications and related action as well as his veto power over permits within the category. § 402(e), 33 U.S.C. § 1342(e). The Administrator may also promulgate regulations, applicable to every approved state program, designating categories of point sources within which the transmittal requirements and veto power will not apply. § 402(f), 33 U.S.C. § 1342(f).

In both the committee reports and floor debates Congress devoted significant attention to the EPA veto power over individual permits granted under state NPDES programs. In that version of the Amendments first passed by the Senate, § 402(d) provided that no permit under a state program could issue "until the Administrator is satisfied that the conditions to be imposed by the State meet the requirements of this Act." S. 2770, 92nd Cong., 2d Sess. § 402(d) (1972). Like the legislation now in effect, the Senate bill authorized EPA waiver of this review requirement on an individual permit or categorical basis. The Public

---

**3.** The Amendments set out the full list of requirements a state program must meet at § 402(b), 33 U.S.C. § 1342(b). Under § 304(h)(2), 33 U.S.C. § 1314(h)(2), EPA sets procedural, monitoring, and enforcement guidelines to which state proposals must conform.

Works Committee explained its understanding of the veto provision:

> Although the Administrator is given the authority to review any permit before it is issued by a State, the Committee expects that, after delegation, the Administrator will withhold his review of proposed permits which are not of major significance.

S.Rep. No. 92–414, 92d Cong., 1st Sess. (1971), *reprinted in* [1972] U.S.Code Cong. & Ad.News, pp. 3668, 3737.

The House rejected the individual permit veto in the version of the Amendments it passed. It authorized EPA to interpose an objection to a state permit only upon notification by another state claiming adverse impact from the proposed permit. H.R. 11896, 92d Cong., 2d Sess. §§ 402(b)(5), 402(d)(2) (1972). The House Public Works Committee explained its failure to include a permit-by-permit veto power in the following terms:

> The Committee considered extensively the proposition that all the permits issued by the States ought to be subject to review and possible veto by the Administrator. During the Committee's hearings, the Governors and other representatives of the States, almost unanimously, stressed the need to put the maximum responsibility for the permit program in the States. They deplored the duplication and second guessing that could go on if the Administrator could veto the State decisions. The Committee believes that the States ought to have the opportunity to assume the responsibilities that they have requested. If, however, a State fails to carry out its obligations and misuses the permit program, the Administrator is fully authorized under subsection (c)(3) of this section to withdraw his approval of a State program.

H.Rep. No. 92–911, 92d Cong., 2d Sess. 127 (1972). During the floor debates in the House, the sponsors of the legislation ech-

oed these arguments for disapproval of the veto power. *See* 118 Cong.Rec. 10219, 10663 (1972) (remarks of Rep. Terry); 118 Cong.Rec. 10662–63 (1972) (remarks of Rep. Roe). Proponents of the veto power contended that it was necessary to deter states from relaxing enforcement to attract industry and that EPA's power to revoke a state's NPDES authority was too unwieldy and drastic a tool to be a useful alternative. *See* 118 Cong.Rec. 10639 (1972) (remarks of Rep. Dingell); 118 Cong.Rec. 10662 (1972) (remarks of Rep. Reuss). The House nevertheless rejected an amendment vesting in EPA a permit-by-permit veto authority similar to that passed by the Senate. *See* 118 Cong.Rec. 10664 (1972).

The Senate view with slight modification prevailed at conference. The conference committee draft, adopted by both houses, reinstated EPA's power to stop issuance of an individual permit by objecting to it as "outside the guidelines and requirements of [the Federal Water Pollution Control Act]." Amendments § 402(d)(2), 33 U.S.C. § 1342(d)(2). The conference committee also brought forward the features of the Senate bill allowing EPA to waive its permit veto power on an individual or categorical basis.

Senator Muskie, the principal author of the Amendments, their sponsor and floor manager in the Senate, and the Senate leader at conference negotiations, prepared for the Senate a statement of his understanding of the conference agreement.[4] Regarding the revival of the permit veto power, he commented as follows:

> The Conference agreement provides that the Administrator may review any permit issued pursuant to this Act as to its consistency with the guidelines and requirements of the Act. Should the Administrator find that a permit is proposed which does not conform to the guidelines issued under section 304 [33 U.S.C. § 1314] and other requirements of the Act, he shall notify the State of his deter-

---

**4.** It should be noted that Senator Muskie informed the Senate in connection with this statement that "we have tried in this legislation not to leave the final evaluation of the bill to legislative history, but instead to write into law as clearly as possible the intent of Congress." 118 Cong.Rec. 33693 (1972).

mination, and the permit cannot issue until the Administrator determines that the necessary changes have been made to assure compliance with such requirements.

118 Cong.Rec. 33698 (1972).

In returning to the House with a bill including the EPA veto that body had previously rejected, the conferees stressed their understanding of the supervisory role EPA would occupy once it approved a state NPDES program. Representative Jones of Alabama explained as follows:

> If the State fails to carry out its responsibility or misuses the permit program, the Administrator is fully authorized to withdraw his approval of the State plan or in the case of an individual permit which does not meet regulations and guidelines in the Act, preclude the issuance of such permit. It is intended, however, that the Administrator shall not take such action except upon a clear showing of failure on the part of the State to follow the guidelines or otherwise to comply with the law.

118 Cong.Rec. 33750 (1972). Congressman Wright echoed the theme of restraint in the EPA's exercise of its supervisory role:

> [I]f the State proposes to issue an unlawful permit . . ., the Administrator may stop the issuance of the permit.
>
> I must give added emphasis to this point. The managers expect the Administrator to use this authority judiciously; it is their intent that the Act be administered in such a manner that the abilities of the States to control their own permit programs will be developed and strengthened.

118 Cong.Rec. 33761 (1972). Both houses passed the legislation as revised by conference committee. Both subsequently voted to override a presidential veto.

This legislative history forms the backdrop to the dispute before this court. Mississippi submitted a proposed NPDES program for EPA approval in August 1973. The federal agency gave its approval on May 1, 1974, transferring authority to issue NPDES permits for dischargers in Mississippi to the Mississippi Air and Water Pollution Control Commission (hereinafter "Commission").

On August 28, 1974, the Commission sent EPA a copy of DuPont's application for a permit to discharge from a proposed titanium dioxide manufacturing plant to be located on St. Louis Bay. The company proposed one discharge point into the Bay and two into a deep well injection system.

EPA did not waive its authority to review the DuPont proposal. Rather the agency undertook consideration of the matter in consultation with the Commission's staff. EPA suggested certain changes in the Commission's proposed permit, including increased monitoring requirements of the deep well discharges and a requirement that DuPont conduct a study to determine the present levels of various elements in the Bay.

On January 17, 1975, the Commission sent EPA a final draft permit, incorporating the requested changes. EPA informed the Commission it would not veto the permit as drafted, but requested further changes. On February 3, 1975, the Commission issued the DuPont permit, which again incorporated all EPA's requests.

Save the Bay, Inc., an incorporated association concerned with environmental protection, filed its petition in this court on March 11, 1975. Petitioner presses two claims. First, it asserts that the Commission so violated federal guidelines in handling the DuPont permit that EPA should have revoked the state's NPDES authority pursuant to § 402(c)(3), 33 U.S.C. § 1342(c)(3). Second, petitioner claims EPA should have vetoed the permit as "outside the guidelines and other requirements" of the Amendments.[5] EPA vigorously responds that this court lacks jurisdiction

---

5. At oral argument counsel for petitioner properly conceded that a third claim, that EPA erred in granting the Commission NPDES authority in the first place, was barred by the 90 day time limit for such claims set out at § 509, 33 U.S.C. § 1369. *See Peabody Coal Co. v. Train*, 518 F.2d 940 (6th Cir. 1975).

over either of petitioner's claims. Our jurisdiction, if any, must be found in § 509(b)(1) of the Amendments, 33 U.S.C. § 1369(b)(1), a limited grant of original jurisdiction to the Court of Appeals:

(b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.[6]

## II. Failure to Withdraw Mississippi's NPDES Authority

Save the Bay alleges that the Commission's treatment of the DuPont permit demonstrated that the state authority is operating contrary to EPA guidelines in several areas, including providing for public participation and policing conflicts of interest. Petitioner contends that EPA's failure to respond by withdrawing the Commission's authority is directly reviewable here as "Administrator's action . . . (D) in making any determination as to a State permit program submitted under section 1342(b) of this title . . ." § 509(b)(1)(D), 33 U.S.C. § 1369(b)(1)(D). EPA responds that the agency has made no

"determination" regarding revocation of the Commission's authority for this court to review.

Though EPA couches its argument in terms of "jurisdiction", the agency does not dispute that, had it undertaken review of the state program and held the public hearing required before revocation under § 402(c)(3), 33 U.S.C. § 1342(c)(3), this court would have original jurisdiction to review EPA's decision to revoke or not to revoke NPDES authority. Such a decision would be a "determination as to a State permit program" within this court's purview under § 509(b)(1)(D), 33 U.S.C. § 1369(b)(1)(D).

■ EPA's contention is rather that the administrative process regarding revocation has not moved sufficiently forward to generate a "determination" for this court to review. The agency at oral argument expressed the position that full administrative development should precede litigation over claims that a state program's permit authority should be withdrawn. Following the approach taken to a very similar problem in *Oljato Chapter of Navajo Tribe v. Train*, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975), we agree and dismiss this portion of the petition without prejudice to its refiling after the administrative process has had an opportunity to run.

In *Oljato*, petitioners claimed that new information required EPA revision of Clean Air Act standards applicable to certain coal-fired electric generating stations. The D.C. Circuit found that the Clean Air Act, § 307(b)(1), 42 U.S.C. § 1857h–5(b)(1), vested it with original jurisdiction to review a decision whether to revise standards on the basis of new information. The court rejected, however, the suggestion that it consider directly the information proffered by petitioners and that it determine whether the data sufficed to require revision of the chal-

---

**6.** Petitioner has simultaneously pursued its complaints about the DuPont permit in the Mississippi state courts. In *Save the Bay, Inc. v. Mississippi Air and Water Pollution Control Commission*, Miss., 341 So.2d 98 (1976), the Mississippi Supreme Court ruled that the Commission should have granted petitioner a fuller hearing in considering the DuPont application.

The court instructed a lower court to remand the case to the Commission for such a hearing.

Because we conclude that we have no jurisdiction to consider petitioner's claim that EPA should have vetoed the permit, we have no occasion to consider the effect of this state judicial review of the state authority's action on federal judicial review of EPA action.

lenged standard. Instead the court required submission of the information to the agency with an opportunity for its response as a condition precedent to judicial review:

> We think, however, that review of the Administrator's refusal is a considerably more desirable approach. Such a procedure would avoid litigation when the Administrator acceded to a request and, when he did not, it would present us with an administrative record, including the Administrator's views in a nonlitigation context, a judicially recognized distinction of importance. *See, e. g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

*Oljato, supra*, 515 F.2d at 666.

The court then fashioned a simple set of requirements to implement the desired decisionmaking procedure:

> (1) The person seeking revision . . . should petition EPA . . . . The petition should be submitted together with supporting materials, or references to supporting materials.
>
> (2) EPA should respond to the petition and, if it denies the petition, set forth its reasons.
>
> (3) If the petition is denied, the petitioner may seek review of the denial in this court . . . .

*Id.* The court concluded that an exchange of letters seeking and denying revision was insufficient in the circumstances before it to form a basis for review. The parties had substantially developed their factual arguments during litigation, outside the administrative record before the reviewing court. Moreover, the fact that the agency had not had the opportunity to respond to petitioner's claims outside the context of litigation raised the danger that its responses would be unreliable after the fact rationalizations. These considerations prompted the court to dismiss the petition without prejudice. *See id.* at 667.

We find that the *Oljato* approach translates most sensibly to the problem before us and requires a like result. To ensure orderly development of the issues and the record, as well as to promote the full and objective application of the agency's expertise, EPA should be given the opportunity independent of litigation to formulate a response to petitioner's allegations regarding the Mississippi program. The circumstances of this case did not afford the agency that opportunity. Save the Bay did send EPA a letter on February 21, 1975, stating its belief that the agency had violated its duty by failing to withdraw NPDES authority from the Commission. While the letter complained of the Commission's handling of the DuPont permit and referenced materials filed by petitioner in Mississippi state court proceedings concerning that permit, the letter did not ask for a hearing or for other agency action relating to revocation of the Commission's NPDES authority. Rather, the letter simply put EPA on notice of petitioner's intent to file suit.[7] On March 11, 1975, Save the Bay filed its petition in this court.

As in *Oljato*, the parties' positions on revocation of the Commission's authority, even regarding matters of fact, have developed in the context of litigation and outside the very limited administrative record before us on review. This petition came only 18 days after EPA received Save the Bay's letter characterizing the failure to withdraw the Commission's NPDES authority as an accomplished violation for which the organization would file suit; here was no proffer of information and request for investigation and a hearing. EPA quickly found itself in the position of justifying past behavior, not considering the most desirable present course of action.

 Accordingly, we cannot proceed to the merits of this claim. Under the procedure fashioned in *Oljato*, a request that EPA revoke a state's NPDES authority and an EPA response are prerequisites to our

---

7. The letter suggested that Save the Bay would file a citizen's suit to require the Administrator to perform a nondiscretionary duty under § 505, 33 U.S.C. § 1365. Petitioner subsequently decided to file in the Court of Appeals.

review.[8] Regarding the nature of EPA's response to such requests, we are quick to join the statement in *Oljato* that

> [n]aturally the expansiveness of the Administrator's articulation of reasons depends on the complexity and substantiality of the issues raised. We are by no means demanding comprehensive responses to frivolous petitions, but nor are we sanctioning summary dismissals of meritorious claims. (Citations omitted). In large part what we will demand by way of response from the Administrator will depend on what is presented by petitioners in support of their claim.

515 F.2d at 666–67. n.19. Moreover, we must emphasize the limited nature of our ultimate review over a decision not to revoke a state's NPDES authority, which would encompass the familiar inquiry whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Finally, we must express some skepticism whether a state authority's unsatisfactory handling of a single permit would ever warrant EPA revocation of NPDES authority, much less judicial reversal of a decision not to revoke. Certain-

ly only the most egregious flouting of federal requirements in the context of an individual permit could justify that sanction. A complaint relating to the treatment of a single permit application therefore seems more appropriately addressed to EPA's veto power over individual permits, to which we now turn. To reiterate, petitioner's claim that EPA should have revoked the Commission's NPDES authority is dismissed without prejudice to refiling after compliance with the procedural requirements set forth above.[9]

### III. Failure to Veto a Permit: Court of Appeals Review

Save the Bay's primary concern before this Court is the DuPont permit. The organization contends that alleged defects in the permit required EPA to block its issuance. Petitioner asks this court to review the agency's failure to do so.

 Our immediate concern is not whether there exists any federal judicial review of the Administrator's decisions whether to veto permits issued under state NPDES programs. Rather it is whether those decisions fall within the limited categories of administrative action over which § 509, 33 U.S.C. § 1369, grants this court

---

8. We by no means suggest that administrative inaction cannot constitute reviewable agency action. The contrary is well established law. *See, e. g., United States v. Joseph G. Moretti*, 478 F.2d 418 (5th Cir. 1973); *Medical Committee for Human Rights v. SEC*, 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *Environmental Defense Fund, Inc. v. Hardin*, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1098 (1970). We speak only to the need for a request for agency action and *opportunity* for agency response within the framework of the particular administrative function before us, EPA's responsibility continuously to surveil state NPDES programs and revoke the authority of any not being administered in accordance with federal guidelines.

In *Oljato*, moreover, the court noted that EPA failure to respond to a request for revision might be appealable to the district court under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which authorize the court to compel "agency action unlawfully withheld or unreasonably delayed". 5 U.S.C. § 706(1). *See* 515

F.2d at 667 n.20. At oral argument EPA suggested that a citizen's suit under the Amendments for failure to perform a non-discretionary duty, § 505, 33 U.S.C. § 1365, might provide similar redress.

9. Our decision is not inconsistent with the conclusion in *Medical Committee for Human Rights v. SEC, supra*, that the SEC's no-action letter regarding a company's decision to omit a shareholders' proxy proposal was sufficiently final and formal for judicial review. There the court lumped under a general rubric of reviewability the related doctrines of ripeness, finality, and exhaustion of administrative remedies. *See* 432 F.2d at 666 n.8. The factors that led the court to conclude the SEC action sufficiently "formal" for review—provision for development of adversary viewpoints before the agency and the presence of some agency response—are here missing. EPA here did not have the opportunity to make an administrative response and made none, not even an indication that it would not decide whether to revoke the Commission's NPDES power.

original jurisdiction. We conclude that § 509 does not encompass EPA's omission to veto a proposed permit under a state program. The language of § 509 suggests this conclusion. The state of the administrative record compiled in consideration of a permit which does not end in a veto supports it.

■ Section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F), provides this court with jurisdiction to review the Administrator's action "in issuing or denying any permit under section 1342". In states that have not obtained approval for their own NPDES programs, this provision unquestionably vests in us review over EPA decisions to issue or deny permits to applicants. In states with approved NPDES programs, however, the role of this provision is less clear, for although EPA's failure to veto a proposed permit leads indirectly to issuance by the state, such EPA action does not necessarily constitute "issuing" for purposes of § 509, 33 U.S.C. § 1369.

The quandary presented by the case at bar is thus the following: when an approved state NPDES authority proposes to grant a permit, does EPA's omission to veto constitute "action in issuing" a permit? [10]

The language of the 1972 Amendments is consistently to the contrary. Permits granted under state NPDES programs are state-issued permits, not EPA-issued. Upon the approval of a state NPDES program, § 402(c)(1), 33 U.S.C. § 1342(c)(1), requires the Administrator to "suspend the issuance of permits under subsection (a)", the subsection authorizing EPA itself to issue permits. Before approving a state program, the Administrator must determine that under the program adequate authority exists "to issue" permits in accordance with the requirements of the Amendments. § 402(b), 33 U.S.C. § 1342(b). Among the materials a state program must transmit to EPA in connection with individual permit applications is "each permit pro-

posed to be *issued by such State.*" § 402(d)(1), 33 U.S.C. § 1342(d)(1) (emphasis added).

The legislative history also suggests that the Administrator's exercise of supervisory review over proposed permits forwarded by state programs is distinct from "issuance" of the permits, which is left to the states. The Senate Public Works Committee described EPA's role as including "the authority to review any permit before it is *issued by a State* . . . .." S.Rep., *supra*, [1972] U.S.Code Cong. & Ad.News at 3737 (emphasis added). Similarly, Congressman Wright explained to the House in the post-conference debates that after EPA approval of a state program, "the States, under State law, could issue State discharge permits." 118 Cong.Rec. 33761 (1972).

Accordingly, we conclude that the Administrator's consideration of a permit proposed to be issued by a State NPDES authority and his decision not to object to the permit do not constitute "action in issuing" a permit within the jurisdictional grant of § 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F). Where the Administrator completely omitted to consider the merits of a state permit proposal and simply allowed the period for objection to run, the Second Circuit has similarly found no action upon which to base Court of Appeals review under § 509. *See Mianus River Preservation Committee v. EPA,* 541 F.2d 899 (2d Cir. 1976).

The inadequacy of the administrative record regarding EPA's failure to veto the DuPont permit buttresses our conclusion. Any assumption that EPA's decision is subject to federal judicial review, however restricted in scope, would raise the question whether review would proceed first in the Court of Appeals under § 509, 33 U.S.C. § 1369, or alternatively in the district courts, either as a suit to compel performance of a nondiscretionary duty under

10. Section 509(b)(1)(D), 33 U.S.C. § 1369(b)(1)(D), grants this court original jurisdiction over EPA action "in making any determination as to a State permit program submitted under section 1342(b) of this title". Without giving any further indication of the

appropriate interpretation of this provision, we do conclude that the reference to a state *program* precludes our predicating upon § 509(b)(1)(D) jurisdiction to review EPA failure to veto an *individual* permit issued under such a program.

§ 505, 33 U.S.C. § 1365, or as a 28 U.S.C. § 1331 action for judicial review under § 10 of the APA, 5 U.S.C. §§ 701–706.[11] To resolve any ambiguity in the scope of the special grant of original review jurisdiction to this court, we assume Congress drafted the provision with reference to the rule that our original jurisdiction can only extend to "agency action capable of review on the basis of the administrative record." *Investment Company Institute v. Board of Governors of the Federal Reserve System*, 551 F.2d 1270, at 1278 (D.C.Cir. 1977); *See also Alabama Ass'n. of Insurance Agents v. Board of Governors of the Federal Reserve System*, 533 F.2d 224 (5th Cir. 1976); *Deutsche Lufthansa Aktiengesellschaft v. CAB*, 156 U.S.App.D.C. 191, 479 F.2d 912, 915–16 (1973).

The administrative record here is wholly inadequate to reveal what factors were considered by EPA in determining not to object, a factual matter of dispute between the parties.[12] Remand to the agency for a statement of reasons for its decision would risk after the fact rationalization, which the evidence gathering powers of a trial court can more easily penetrate. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420–21, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Judicial imposition of a requirement that citizens petition EPA to veto permits and that EPA respond as prerequisites to Court of Appeals review would unduly formalize and delay what Congress clearly intended to be a most flexible, informal supervisory function. Given these considerations, this tribunal is not a forum that can provide such elucidation of the facts as would make judicial review meaningful and significant, and not skeletal and cursory. When Congress has vested this court with original review, it generally has done so in relation to an administrative process that more easily lends itself to production of a reviewable record. All these factors support the conclusion that the original jurisdiction of this court over EPA action in "issuing" a permit, § 509(b)(1)(F), 33 U.S.C. § 1369(b)(1) (F), should not be construed to encompass review of EPA's action in failing to veto a state NPDES permit.[13] Upon that conclusion, petitioner's claim that EPA should have vetoed the DuPont permit, must be dismissed.

## IV. Failure to Veto: District Court Reviewability

We have concluded that Save the Bay's petition must be dismissed as respects both of its claims. Technically, our obligation is at an end. Our conclusions, however, raise the question whether EPA's decision not to veto a permit is reviewable in the district court or not reviewable at all. We could lay aside this question for another day. To do so, however, would require this petitioner or another once again to spin the wheel of jurisdictional fortune and to spend two years in litigation only to return to this court a question of law. Considerations of judicial economy and fairness require us to address the question of district court reviewability as presented by the circumstances surrounding the DuPont permit.

---

**11.** Any doubts about jurisdiction to engage in APA review were eliminated by Pub.L.No. 94–574, 90 Stat. 2721 (1976), which deleted the amount-in-controversy requirement as to "[any] action [under 28 U.S.C. § 1331] brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

**12.** That record consists merely of DuPont's permit application, Mississippi's draft permit, correspondence between EPA and the Commission regarding desired changes in the permit, EPA's notification to the Commission that it would not veto the permit, and Save the Bay's subsequent notice of intent to sue EPA for, *inter alia*, failing to veto the permit. Save the Bay's letter incorporated by reference a complaint regarding the DuPont permit filed in state court.

**13.** Though it disputes reviewability, EPA itself takes the position that any federal review of its failure to veto a permit lies in the district courts. (Respondent's Brief at 29).

We note that by our decision we suggest no answer to the question whether a veto by EPA would be reviewable directly in this court. That problem poses the question whether veto of a permit someone else proposes to grant is any more a "denial" of the permit than a failure to veto is an "issuance."

■ A long-standing and strong presumption exists that action taken by a federal agency is reviewable in federal court. *See, e. g., Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To the extent EPA's review of and decision not to veto a proposed state NPDES permit are reviewable, an aggrieved person may obtain review under Section 10 of the APA, 5 U.S.C. §§ 701–706, invoking the district court's jurisdiction under 28 U.S.C. § 1331. The question we now address is whether or to what extent such action by EPA is exempt from APA review because "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

■ The Supreme Court has stated in strong terms that the exemption from APA review of action "committed to agency discretion" "is a very narrow exception." *Citizens to Preserve Overton Park, Inc., supra*, 401 U.S. at 410, 91 S.Ct. at 821. The exception applies only

in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply."

*Id.* That a statute by its terms permits, rather than compels, agency action does not alone commit that action to the agency's unreviewable discretion. *See Mulloy v. United States*, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Environmental Defense Fund, Inc. v. Hardin*, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970). Moreover, in those rare instances when a decision in its totality lies within an agency's unreviewable discretion, judicial review will still frequently be available for limited, specific issues subsumed in the decisionmaking process. *See Ness Investment Corp. v. United States Department of Agriculture*, 512 F.2d 706 (9th Cir.

1975); *East Oakland-Fruitvale Planning Council v. Rumsfeld*, 471 F.2d 524 (9th Cir. 1972); *Medical Committee for Human Rights v. SEC*, 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). Such partial review serves to protect individuals' interests adversely affected by agency action while imposing only limited, acceptable intrusion upon the administrative process and the dockets of the federal courts. *See* Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968). Along these lines it has been said that "[T]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed." 4 K. Davis, Administrative Law Treatise 33 (1958), *quoted in Medical Committee for Human Rights, Inc. v. SEC, supra*, 432 F.2d at 673 (emphasis in quote).

Applying these principles to the situation in which EPA undertakes consideration of the merits of a proposed permit and decides on the basis of that consideration not to veto it, we find that only the most limited partial review is available in the district court. In this situation, which is presented by the case at bar, the agency unquestionably has engaged in a decisionmaking process and reached a resolution. That the agency's decision is to forego a course of action does not automatically signify that the agency has taken no reviewable action by its decision. *See United States v. Joseph G. Moretti*, 478 F.2d 418 (5th Cir. 1973); *Medical Committee for Human Rights, supra; Environmental Defense Fund, Inc. v. Hardin, supra*, 428 F.2d at 1098. Having chosen to act, the agency had to conform its actions to the boundaries of the law. The question is whether the law here supplies any boundaries or whether it is drawn in such broad terms that there is "no law to apply."[14]

---

**14.** We pretermit the question of the reviewability of the failure by EPA to take any action regarding a proposed State NPDES permit. That is, we are not concerned here with the situation in which EPA receives notice of a

proposed permit and allows the period for objection to pass without undertaking any consideration of the merits of the proposed permit and its consistency with the requirements of the 1972 Amendments. That situation was be-

The Administrator may veto proposed permits on the grounds that they are "outside the guidelines and requirements" of the Amendments. § 402(d)(2), 33 U.S.C. § 1342(d)(2). The reference to guidelines and requirements includes at least the effluent limitation regulations promulgated under § 301, 33 U.S.C. § 1311, the more general effluent limitations guidelines issued under § 304(b), 33 U.S.C. § 1314(b), and the guidelines governing the procedure for issuing NPDES permits, promulgated under § 304(h), 33 U.S.C. § 1314(h). *See E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 977–78 n. 25, 51 L.Ed.2d 204 (1977).

While these guidelines and regulations could provide "law to apply" in reviewing a decision not to veto a permit, the legislative history makes very clear that Congress intended EPA to retain discretion to decline to veto a permit even after the agency found some violation of applicable guidelines. That legislative history, more explicit and unequivocal than generally found, leans in almost every expression toward a minimal federal intervention when a state plan has been approved. First, there was a significant shift in the language of the veto provision during the legislative process. The original Senate version provided that, unless the Administrator affirmatively waived his review of a specific permit, it could not issue "until the Administrator is satisfied that the conditions . . . meet the requirements of this Act." The conference compromise, in addition to retaining the waiver provisions, allows the state permit to issue unless the Administrator affirmatively objects, which the statute authorizes, but does not expressly require, upon a finding of departure from the guidelines. While the use of permissive language is of little persuasive effect itself, the shift from the original Senate version does suggest that not every permit out of compliance with the guidelines need be vetoed.

The post-conference floor debates also disclose intent to confer such discretion. The House had originally rejected any permit-by-permit veto power. The floor managers set out to mollify opponents of that power by explaining the nature of the veto prerogative inserted at conference. Representative Jones emphasized that the Administrator was not intended to veto a permit except upon a "clear showing" of noncompliance with the guidelines. 118 Cong.Rec. 33750 (1972). Congressman Wright noted that the Administrator "may stop" the issuance of an unlawful permit and further explained:

> I must give added emphasis to this point. The managers expect the Administrator to use this authority judiciously; it is their intent that the Act be administered in such a manner that the abilities of the States to control their permit programs will be developed and strengthened.

118 Cong.Rec. 33761 (1972).

■ The primacy of state and local enforcement of water pollution controls is a theme that resounds throughout the legislative history of the Amendments. In light of the pervasiveness of this theme, the specific references to the veto power above, and the conferral of broad discretion to waive review of individual permits, we conclude that Congress intended to allow the Administrator to consider the significance of any guideline violations in terms of the overall goal of the Amendments, the elimination of all discharge of pollutants into the nation's navigable waters by 1985. Federal

---

fore the Second Circuit in *Miamus River Preservation Committee v. Administrator*, 541 F.2d 899 (2d Cir. 1976). The court decided that § 509, 33 U.S.C. § 1369, vested the court of appeals with no jurisdiction to review such inaction, but it did not explicitly decide the question of reviewability *per se*. *See* 541 F.2d at 909. The court's analysis, however, left little room for a suggestion of reviewability. *See id.* at 909 n. 24.

It is clear that the Amendments leave the Administrator large discretion to waive review of individual permit applications. § 402(d)(3), 33 U.S.C. § 1342(d)(3). It remains less obvious what discretion the Administrator possesses to undertake no consideration of applications over which he does not waive review. We need not and do not attempt to resolve this question.

refractions are to be very limited, and 20/20 vision by the states is not to be expected or exacted. To conclude otherwise would contravene the spirit of the federal-state partnership created by the Amendments and establish an undue incentive for the EPA to waive review of proposed permits.

■ Given discretion to weigh the substantiality of any violations of the guidelines and requirements of the Amendments as well as a mandate to determine the presence of such violations, EPA's decision not to veto a particular permit takes on a breadth that in our judgment renders the bottom line of that decision unreviewable in the federal courts. Once the relevant factors are before the agency, it can weigh them within this broad mandate with an expertise to which the restraining powers of judicial review could add little. Given such a mandate, a judge's judgment on the significance in terms of water quality of the provisions of a permit is not likely to be sounder or fairer to the challenger, whether environmentalist or industrialist, than that of the EPA. *See* Note, *D. C. Federation of Civic Associations v. Volpe: Blessing or Burden?*, 27 Stan.L.Rev. 125 (1974).

Thus our situation is much like that faced by the Ninth Circuit in *East Oakland-Fruitvale Planning Council v. Rumsfeld*, 471 F.2d 524 (9th Cir. 1972). There Governor Reagan had vetoed a proposed community project grant from the Office of Economic Opportunity (OEO). Plaintiffs complained of OEO's failure to exercise its power to override the veto in cases of grants "consistent with the provisions and in furtherance of the purposes of the Act." 42 U.S.C. § 2834. The court found that this "extremely general standard" required OEO to take into consideration such ineffables as the "wisdom or desirability" of a particular project and in the process to apply its experience and expertise regarding the efficacy of such experimental projects. The court concluded that the decision whether to override was committed to the agency's discretion. *See also Greater New York Hospital Association v. Mathews*, 536 F.2d 494 (2d Cir. 1976); *Ness Investment Corp. v. United*

*States Department of Agriculture*, 512 F.2d 706 (9th Cir. 1975).

While the discretion of the Administrator in considering the proposed permit appears to extend no further than the significance of any violations of requirements of the Amendments in terms of the overall goal of eliminating water pollution, we find that the scope of that discretion is such "that it would not afford a reviewing court a practicable rule for determining the legality of the . . . ultimate decision . . . " *East Oakland-Fruitvale Planning Council, supra*, 471 F.2d at 533. Accordingly, we hold that the Administrator's conclusion not to veto an individual permit is itself immune to judicial review.

As in *East Oakland-Fruitvale Planning Council, supra*, however, this observation does not mean that the Administrator is completely beyond the scrutiny of the federal courts in performing the supervisory role over state permits that Congress, after exhaustive debate on the specific subject, saw fit to establish:

An "all or nothing" approach to reviewability would, in specific cases, either be unfair to persons aggrieved by agency action, or impose an unwise burden upon the agency or the courts. Accordingly, separable issues appropriate for judicial determination are to be reviewed, though other aspects of the agency action may be committed to the agency's expertise and discretion.

*Id. See also Ness Investment Corp., supra; Medical Committee for Human Rights, supra; Saferstein, supra.*

While Congress in considering the Amendments articulated a definite commitment to a hands-off policy toward the states, equally clearly it did not intend the hands of the federal government completely to be tied. In light of the precedent for partial review of administrative action, we must be loathe totally to eradicate judicial review from a legislative framework in which the federal government has not wholly abdicated its role. From that perspective we find that judicial review may appropriately confine EPA's discretion along two very narrow lines. First, nothing in the statute or its history suggest any basis for allowing EPA in reviewing the merits of a permit totally to omit consideration of a

particular violation of the guidelines and requirements of the Amendments. When all the relevant factors are before the agency, there is such insufficient likelihood of improving the decision that the presumption for judicial review falls. Judicial review, however, can quite easily be effective to assure that all those factors receive the agency's attention. Accordingly, an aggrieved person must be able to present a claim in district court that a proposed permit contains a violation of applicable federal guidelines that the agency has failed to consider. Upon sufficient showing of a violation, the agency, if it claims to have attended to the factor during its review, will have to explain in a manner that cannot be labeled arbitrary how it concluded the violation did not warrant veto. Failing that, it will have to reconsider its decision in light of the new factor.

The other available avenue of review runs in precisely the opposite direction. There is no suggestion anywhere in the Amendments' history that EPA may base a decision not to veto on factors other than a specific permit's consistency with the guidelines or the insignificance of any departures. There must accordingly be room for claims that unlawful factors have tainted the agency's exercise of its discretion. For example, there is no room for consideration of the political popularity of a decision to veto a permit and, thereby, some local project. Nor could EPA let pass a permit it would otherwise veto on acknowledgement of the fact that the state agency involved had generally drawn up lawful permits. Once EPA explained or removed the alleged illegitimate factor, of course, the final decision not to veto would be within its unreviewable discretion.

These two avenues of review raise narrow issues that a district court may expeditiously resolve. They involve a bare minimum of intrusion on the agency's processes. As was said in a similar context,

> Limited and partial review to examine the legal framework within which administrative discretion must be exercised is scarcely a doctrinal innovation . . . .
> We foresee scant possibility that such sharply circumscribed review, which depends upon the [Administrator's] initial determination to review the [permit] will cause the destruction of informal advisory and supervisory functions . . . .

*Medical Committee for Human Rights, supra,* 432 F.2d at 675.

With only that minimal intrusion, the partial review outlined will help assure that potentially serious violations of law in proposed permits that threaten individuals or businesses will not go unattended as EPA carries out the supervisory responsibility Congress unequivocally placed within its walls. The limited scope of the reviewable issues and the nonreviewability of EPA's final determination offer sufficient sanctuary from any imagined onslaught of frivolous petitions. The courts may easily supply this limited review. To do less would be to ignore the limited but important federal side of the partnership created by the Amendments; moreover, it would be unnecessarily to denigrate the role of private citizens of all persuasions in the administrative process and to abrogate the strong presumption in favor of judicial review of administrative action.[15]

## V. Conclusion

We have been called upon to examine a statutory scheme that has the potential for the optimum of federalism. The legislation contains problems of accommodation that will require additional interstitial interpretation and environmental exploration as the partners pirouette. The success of their federalist venture will depend not only

---

15. The limited review we find available is consistent with the recent ruling in *Morris v. Gressette*, —— U.S. ——, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). There the Court held unreviewable the Attorney General's failure to interpose a timely objection under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, to a change in the voting laws of a jurisdiction subject to that act. The Court did rely in reaching this conclusion on the fact that the 60 day limit on the Attorney General's time to object indicated congressional intent to provide an expeditious process that judicial review would lengthen. The Court consistently emphasized two additional factors that exacerbated the harms associated with delay and that, together with the congressional intent to limit delay, justified the conclusion of nonreviewability. First, the Court emphasized the "unusual" and "severe" nature of the § 5 remedy, which requires states to submit validly enacted legislation within the traditional purview of state governments to federal authori-

upon the grace, but also the substance of movement by both partners in the ballet. We have endeavored to ink a most self-effacing role for the federal judiciary, one which should foster a harmonious background to the dance and necessitate intervention only when a point of unmelodious discord seriously threatens the contrapuntal balance.

The petition of Save the Bay, Inc., insofar as it claims the Administrator has unlawfully failed to revoke the NPDES authority of the Mississippi Commission, is DISMISSED WITHOUT PREJUDICE. Insofar as it seeks review of the failure to veto the DuPont permit, it is

DISMISSED.

ties and to delay implementation pending opportunity for federal scrutiny of that legislation. *See id.* at ——, 97 S.Ct. 2411. Second, the Court repeatedly pointed out that citizens could raise the same challenge in subsequent litigation that they sought to do through review of that failure to veto. The failure to veto is not conclusive of the constitutionality of the state voting law change. *See id.* at ——, 97 S.Ct. 2411.

The importance of these factors to the majority's decision may be seen in its rejection of the claim by Justice Marshall in dissent that *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), is inconsistent with the analysis employed by the majority. *See id.* —— U.S. —— at n. 10, 97 S.Ct. 2411 (Marshall, J., dissenting). In *Bachowski* the court held reviewable the Secretary of Labor's decision not to challenge the validity of a union election under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 482. The Secretary's decision had been similarly circumscribed by a 60 day time limit.

The majority distinguished *Bachowski* from the Voting Rights Act problem before it on the basis of the two factors noted above. Nothing like the severity of the § 5 remedy was involved in *Bachowski*. *See* —— U.S. at ——, n. 20, 97 S.Ct. 2411. Moreover, suit by the Secretary of Labor provided the exclusive post-election remedy for the complainants in *Bachowski*, strengthening the case for administrative review of the Secretary's decision not to sue. *See id.*

The same reasons given by the majority in *Morris* to distinguish *Bachowski* distinguish the case at bar and confirm the propriety of the

review we have found, which we note is even more limited in scope than that authorized in *Bachowski*. First, the intrusion on state sovereignty by EPA's veto power is miniscule in comparison to the § 5 preclearance requirement. Congress could have placed all permit authority in the EPA. Instead it brought the states into the partnership. To require some federal scrutiny of a state's action in issuing a permit under *delegated federal authority* does not begin to impinge on the state's autonomy in the way federal preclearance of state legislation might be thought to do. Moreover, scrutiny of an individual permit of course has but limited effect on the state NPDES program as a whole. Second, and perhaps more important, for a citizen concerned that a discharger meet the strict federal requirements of the 1972 Amendments, there is no avenue for challenging the terms of a permit once EPA has allowed it to issue. Discharge in compliance with the terms of a permit is with very limited exceptions deemed compliance with the Amendments. *See* § 402(k), 33 U.S.C. § 1342(k). A citizen may sue to enforce the terms of a permit, but he or she may not complain that those terms themselves fail to implement the applicable guidelines and requirements. The very limited review we have outlined over EPA's supervisory role in this critical process of translating the Amendment's requirements into the terms of individual permits is fully justified in light of this balance of interests, a balance we find mandated by the majority's analysis in *Morris*.