573 F.2d 583
 11 ERC 1339, 8 Envtl. L. Rep. 20,314
 STATE OF WASHINGTON, and its Department of Ecology, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Russell E.
Train, Administrator, and Clifford V. Smith, Jr.,
Regional Administrator, Region X, Respondents.
SCOTT PAPER COMPANY, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Russell E.
Train, Administrator, and Clifford V. Smith, Jr.,
Regional Administrator, Region X, Respondents.
SCOTT PAPER COMPANY, Plaintiff-Appellant,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Russell E.
Train, Administrator, and Clifford V. Smith, Jr.,
Regional Administrator, Region X,
Defendants- Appellees.
 Nos. 75-2479, 75-2494 and 76-1305.
 United States Court of Appeals,
Ninth Circuit.
 March 6, 1978.
Rehearing Denied April 14, 1978.
 
 Charles W. Lean, Asst. Atty. Gen., Olympia, Wash., for petitioners.
 Michael D. Graves, Esq., Washington, D. C., for respondents.
 On Petition for Review of an Order of the United States Environmental Protection Agency Nos. 75-2479 and 75-2494.
 Appeal from the United States District Court for the Western District of Washington No. 76-1305.
 Before KOELSCH, DUNIWAY and GOODWIN, Circuit Judges.
 KOELSCH, Circuit Judge:
 
 
 1
 These three matters[1] arise under the Federal Water Pollution Control Act Amendments of 1972, Public Law 92-500, 86 Stat. 816, 33 U.S.C. § 1251 et seq.[2]
 
 
 2
 They commonly concern objections of the Regional Administrator[3] of the United States Environmental Protection Agency (EPA) to a National Pollutant Discharge Elimination System (NPDES) permit issued by the State of Washington through its Department of Ecology (DOE) to Scott Paper Company (Scott) for the discharge of sulphite wastes from the latter's wood pulp and paper mill near Anacortes, Washington, into the waters of Puget Sound (the Anacortes permit).[4]
 
 
 3
 Prior to issuing the permit, DOE transmitted a copy to the Administrator, who registered his formal objection to the permit as proposed by DOE. Notwithstanding the Administrator's purported veto under § 402(d)[5] of the Act, DOE issued the permit to Scott; the Administrator then proceeded to impose sanctions on Scott.[6] This precipitated these several proceedings.
 
 
 4
 The provision, relied upon by the district court as the ground for dismissal of Scott's suit for declaratory and injunctive relief, and likewise urged by petitioners here as the one vesting this court with original jurisdiction, appears in subsection (b)(1) of § 509.
 
 
 5
 The subsection itself is headed "Review of the Administrator's action" and is followed by a specification of six "actions" which a court of appeals is given jurisdiction to review at the behest of an interested person. The particular provision relied upon is 509(b)(1)(F). It reads thus:
 
 
 6
 "Review of the Administrator's action
 
 
 7
 "(F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals of the United States . . . ."
 
 
 8
 In terms, at least, this provision does not extend to a state's grant or rejection of a permit; it is limited to the Administrator and to his own action in issuing or denying a permit, not to his objection to a state's action in doing so. Nor does the Act's legislative history reveal any statement or basis for the conclusion that the lawmakers intended to include state action within § 509. Neither does § 402 afford any basis for a different conclusion; in substance, that section contemplates that for a limited period of time following the effective date of the Act, the Administrator will issue or deny NPDES permits, but also makes provision for the states to take over that function upon compliance with certain conditions. See § 402(a), (b) and (c). Thus it would seem fair to conclude from a literal reading of the provisions of § 509(b)(1)(F) that when the Congress spoke of the Administrator's action in "issuing or denying" any permit, it had in mind this period during which the Administrator was to act in such matters and was mindful that the states would probably shortly take over the permitting authority. Nor does anything in § 402 or elsewhere in the Act suggest the existence of an agency relationship between the Administrator and a state so that the latter's action in issuing or denying a permit could be deemed action of the Administrator. To the contrary, § 402 makes clear that once the state has secured approval of its own permit program, its actions in permit matters are those of the state itself, subject to the Administrator's veto under § 402(d). See Shell Oil Co. v. Train, 415 F.Supp. 70, 77 (N.D.Cal.1976).
 
 
 9
 It is vigorously contended that § 402(d)(2)(B) the provision under which the Administrator purported to veto the Anacortes permit brings the matter within the purview of § 509(b)(1)(F). That provision reads:
 
 
 10
 "(2) No permit shall issue
 
 
 11
 "(B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this Act."
 
 
 12
 In substance, the argument is that the Administrator's objection to a state-issued NPDES permit constitutes "action" in denying a permit. But the predicate for this argument requires an exercise in verbal gymnastics which we find wholly unwarranted. As already pointed out, § 509 in clear and unmistakable language limits itself to the Administrator's own permit functions. Both the Second and Fifth Circuits in instances where an interested person initiated a proceeding in a Court of Appeals under the purported authority of § 509 to review the Administrator's refusal or failure to object to a state-issued permit have read and applied the provision literally, taking the view that the Administrator's failure or refusal to act is not tantamount to the kind of "action in issuing a permit" intended by § 509(b)(1)(F). Save the Bay, Inc. v. Administrator of E. P. A., 556 F.2d 1282 (5th Cir. 1977); Mianus River Reservation Committee v. Administrator, 541 F.2d 899 (2d Cir. 1976). True, those decisions dealt with the "issuing," not the "denying," clause of the provision, but we think the rationale of Save the Bay and Mianus River is applicable here. The common sense of the phrase "to the issuance" does not connote "fail to object." And if the text of § 509 will not support such a strained construction of "action in issuing," neither will it support a construction equating "action in denying" with "objecting." Not only is the language of § 509(b)(1)(F) clear and unequivocal, but neither the text nor the legislative history of the statute lends any support to a judicial construction which would fracture the provision in halves, equating "denying" with "objecting," but not equating "issuance" with "not objecting." We decline to place so radical a gloss upon the provision.
 
 
 13
 It follows that we are obliged to dismiss the two petitions.
 
 
 14
 We come now to the question whether the district court (in No. 76-1305) was correct in ruling that it lacked jurisdiction to entertain and decide Scott's suit for declaratory and injunctive relief. Our conclusion that we lack subject matter jurisdiction over petitioners' claims under § 509 does not necessarily mean that the Administrator's action in objecting to the Anacortes permit is not subject to judicial review at all. Generally, final administrative action is presumed to be subject to judicial review at the instance of an aggrieved party and "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). See also Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Rusk v. Cort, 369 U.S. 367, 379-380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Bays v. Miller, 524 F.2d 631, 632 (9th Cir. 1975); Montana Chapter of Ass'n of Civilian Technicians, Inc. v. Young, 514 F.2d 1165, 1168 (9th Cir. 1975); Washington Utilities & Transp. Commission v. F.C.C., 513 F.2d 1142, 1145-46 (9th Cir. 1975), cert. denied,423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).
 
 
 15
 The mere fact that Congress prescribed a specific mode of judicial review for those actions of the Administrator enumerated in § 509(b)(1) of the Act does not alone suffice to preclude an alternative form of judicial review of final administrative action not encompassed within the provision of § 509(b)(1): " 'The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.' " Abbott Laboratories v. Gardner, supra, 387 U.S. at 141, 87 S.Ct. at 1511. "(O)nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Id. at 141, 87 S.Ct. at 1511. See also Dunlop v. Bachowski, supra, 421 U.S. at 567, 95 S.Ct. 1851; Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 410, 91 S.Ct. 814; Rusk v. Cort, supra, 369 U.S. at 379-380, 82 S.Ct. 787; Kitchens v. Department of Treasury, 535 F.2d 1197, 1199 (9th Cir. 1976); Rothman v. Hospital Service of Southern California, 510 F.2d 956, 958 (9th Cir. 1975).
 
 
 16
 Nothing in the structure of the statutory scheme, its legislative history, or the nature of the Administrator's action in objecting to a proposed state-issued NPDES permit suggests that Congress meant to preclude judicial review of the Administrator's exercise of the veto power conferred by § 402(d). Cf. Save the Bay, Inc. v. Administrator of E. P. A., supra; Mianus River Preservation Committee v. Administrator, supra. Indeed, the very breadth of those actions of the Administrator explicitly subjected to judicial review by the terms of § 509(b)(1) strongly suggests that Congress did not intend to insulate the Administrator's objection to a state-issued NPDES permit from judicial review.
 
 
 17
 Against this background, the Act's failure to explicitly prescribe a means of judicial review of the Administrator's exercise of the veto power under § 402(d) suggests no more than a legislative oversight: "The only reasonable inference is that the possibility did not occur to the Congress." Wirtz v. Bottle Blowers Ass'n, 389 U.S. 463, 468, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968). Scott is thus entitled to the "basic presumption" that the Administrator's action in objecting to the issuance of the Anacortes permit is subject to judicial review and, as a party aggrieved by final administrative action, Scott may obtain review of the Administrator's action under Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Abbott Laboratories v. Gardner, supra, 387 U.S. at 140, 87 S.Ct. 1507; Save the Bay, Inc. v. Administrator of E. P. A., supra, 556 F.2d at 1293; Bays v. Miller, supra, 524 F.2d at 632.
 
 
 18
 Although we hold that the district court has jurisdiction to entertain Scott's challenge to the Administrator's objection to the Anacortes permit, we need not, in light of the record before us, remand the case for additional proceedings. That course is made unnecessary by the presence of a dispositive legal issue which we resolve in the interests of judicial economy. Cf. Save the Bay, Inc. v. Administrator of E. P. A., supra, 556 F.2d at 1292.
 
 
 19
 Scott contends that in the absence of effluent limitation guidelines promulgated by EPA in the form of regulations and applicable to point sources[7] of the Anacortes type, the Administrator lacks authority under § 402(d) of the Act to object to state-issued NPDES permits. We are compelled to agree, based upon an examination of the statutory scheme and a consideration of the procedural consequences of a contrary holding.
 
 
 20
 As indicated, although commanded by Congress to "publish within one year of enactment of this title (i. e., by October 18, 1973), regulations, providing guidelines for effluent limitations" (§ 304(b)), "(t)he various deadlines imposed on the Administrator were too ambitious for him to meet." E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 122, 97 S.Ct. 965, 972, 51 L.Ed.2d 204 (1977). See also National Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 510 F.2d 692 (1975). Specifically, as of the date the Administrator purported to object to the Anacortes permit under § 402(d), he had not yet published effluent limitation guidelines applicable to the pulp and paper industry in the form of regulations as called for by § 304(b) of the Act.[8] In the absence of such guideline regulations the Administrator perforce relied on other grounds in purporting to find that the Anacortes permit did not reflect best practicable control technology (or "BPT") and was therefore "outside the guidelines and requirements of (the) Act" within the meaning of § 402(d)(2)(B). The technical basis upon which the Administrator relied in objecting to the Anacortes permit consisted of certain "interim guidance documents" which, according to the Administrator, provided technical data approximating BPT values for facilities of the Anacortes type which would have been applicable had effluent limitation guidelines for pulp and paper point sources been timely issued in the form of regulations as contemplated by § 304(b).
 
 
 21
 We conclude, however, that as a matter of statutory interpretation the Administrator's exercise of the veto power conferred by § 402(d) is contingent upon the antecedent formulation of guideline regulations under § 304(b) in conformity with the rule making provisions of the Administrative Procedure Act, 5 U.S.C. § 553.
 
 
 22
 As noted, the Administrator's exercise of the veto power under § 402(d) is expressly conditioned upon and confined to a finding that the state-issued NPDES permit in question is "outside the guidelines and requirements of (the) Act." § 402(d)(2)(B). It is conceded that the Administrator objected to the Anacortes permit as proposed by DOE on the specific ground that the permit failed to require the achievement of BPT at the Anacortes plant within the meaning of § 301(b)(1)(A).[9]
 
 
 23
 We first dispose of the Administrator's contention that the term " guidelines" as used in § 402(d)(2)(B) refers only to the guidelines establishing uniform procedures for state-administered NPDES permit programs which the Administrator is required to issue by § 304(h).[10] The language of the statute itself plainly suggests that Congress intended the effluent limitation guidelines to take the form of regulations. Subsection 304(b) provides that "(f)or the purpose of adopting . . . effluent limitations under this Act the Administrator shall . . . publish . . . regulations, providing guidelines for effluent limitations . . . ." (Emphasis added.) Moreover, in discharging his guideline development function under § 304(b), Congress directed the Administrator to consult "with appropriate Federal and State agencies and other interested persons . . . ." Id. Recourse to the legislative history of the Act indicates that in enacting the clause emphasized above, Congress intended the Administrator to promulgate § 304(b) guidelines in accordance with the rule making provisions of the APA. Thus, the report of the Senate Conference Committee observed that
 
 
 24
 "In various places in section 304, and elsewhere in the bill, it is required that the Administrator of EPA publish guidelines on various aspects of the program. The conferees expect that such guidelines will be subject to the normal requirements which apply to Federal regulations, such as publication in the Federal Register and availability for public comment, even though those requirements were not made explicit each separate time a guideline has been required by the bill." Leg. History at 172.[11]
 
 
 25
 In light of the language of § 304(b) and the relevant legislative history, we are clear that Congress intended the Administrator to formulate effluent limitation guidelines expressing BPT for classes and categories of point sources only after giving "interested persons an opportunity to participate in the (effluent limitation guideline) rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553. See Save the Bay, Inc. v. Administrator of E. P. A., supra, 556 F.2d at 1294; cf. E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 133, 97 S.Ct. 965, 51 L.Ed.2d 204 n. 24 (1977); Ford Motor Co. v. U.S. EPA, 567 F.2d 661, 671-72 (6th Cir. 1977). That he did not do here. As we will endeavor to show later in this opinion, that failure is fatal to his position.
 
 
 26
 Had the Administrator issued § 304(b) guidelines for pulp and paper point sources in conformity with the procedure prescribed by 5 U.S.C. § 553 prior to the time he purported to object to the Anacortes permit, Scott could not now complain that it had not had its day before the Administrator in the formulation of generally applicable effluent limitation standards. The Administrator could have measured the effluent limitations imposed upon Scott's Anacortes plant as proposed by DOE against the general standards applicable to classes and categories of pulp and paper point sources developed in the course of the § 304(b) rule making process and, on a finding that the BPT requirements proposed by DOE were "outside the guidelines and requirements of (the) Act," vetoed the permit under § 402(d)(2)(B). Scott (or any other aggrieved party) could then have secured judicial review of the Administrator's objection under the provisions of § 10 of the APA and relevant case law. See 5 U.S.C. §§ 701-706; Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 27
 We necessarily adopt the subjunctive tense in outlining the procedural course that matters might have taken had the Administrator timely published effluent limitation guideline regulations under § 304(b) prior to objecting to the Anacortes permit. As matters stand, however, the Administrator has purported to nullify a state-issued NPDES permit and to threaten the permit applicant with civil penalties on the basis of criteria that have not been subjected to the safeguards of public rule making proceedings.[12] We are clear, upon a review of the statutory scheme, that Congress did not intend to deprive permit applicants of the significant procedural opportunity to contribute to the formulation of administrative guidelines through participation in public rule making proceedings by permitting the Administrator to object to a proposed state-issued NPDES permit in the absence of duly published guideline regulations and on the basis of what is in effect an ad hoc determination of what constitutes BPT for an individual point source.
 
 
 28
 We must determine, however, whether the achievement of effluent reductions through the application of BPT is a ". . . requirement of (the) Act" within the meaning of § 402(d) in the absence of § 304(b) guideline regulations. Reluctantly, we conclude that it is not. The express language of § 301(b) of the Act does not in terms require the reduction of effluents through the application of BPT no matter how expressed or determined. Rather, it calls for the achievement of "effluent limitations . . . which shall require the application of (BPT) as defined by the Administrator pursuant to Section 304(b) of this Act . . . ." § 301(b)(1)(A); emphasis added. Section 304(b), in turn, provides that
 
 
 29
 "(b) For the purpose of adopting or revising effluent limitations under this Act the Administrator shall . . . publish(ed) within one year of enactment of this title, regulations, providing guidelines for effluent limitations . . . ."
 
 
 30
 Thus, "(t)o summarize, § 301(b) requires the achievement of effluent limitations requiring use of the 'best practicable' . . . technology. It refers to § 304 for a definition of these terms. Section 304 requires the publication of 'regulations, providing guidelines for effluent limitations.' " E. I. duPont de Nemours & Co. v. Train, supra, 430 U.S. at 121, 97 S.Ct. at 971.
 
 
 31
 The term "guidelines" appears again in the operative clause of § 402(d)(2) (B) circumscribing the Administrator's use of the veto power without explication. We are clear that the term "guidelines" as used in defining the veto power of § 402(d) includes the effluent limitation guidelines which the Administrator is required by § 304(b) to develop and issue in the form of regulations. Cf. E. I. duPont de Nemours & Co. v. Train, supra, 430 U.S. at 133 n. 24, 97 S.Ct. 965; Save the Bay, Inc. v. Administrator of E. P. A., supra, 556 F.2d at 1294. The "guidelines and requirements" clause of § 402(d)(2)(B) thus points back to the guideline regulations of § 304(b), the existence of which, as indicated, is an explicit precondition for the statutory requirement of § 301(b) that effluent reductions be achieved through the application of BPT.
 
 
 32
 Our conclusion that the Administrator's power of objection under § 402(d) is conditioned upon the existence of § 304(b) guideline regulations prescribing BPT for classes and categories of point sources is not only commanded by a fair reading of the statutory language but is also operationally consistent with the permit issuing sequence contemplated by the Act. As we construe the mechanics of the statutory scheme, Congress envisioned that the Administrator would not have occasion to exercise the veto power conferred by § 402(d) in the absence of effluent limitation guideline regulations promulgated under § 304(b).
 
 
 33
 As contemplated by the Act, issuance of effluent limitation guideline regulations under § 304(b) would precede the transfer of the NPDES permitting function from EPA to the several states. The § 304(b) guidelines would thus perform their intended function of guiding state NPDES permit authorities in determining BPT for individual point sources by expressing effluent limitation values achievable through application of the technical requirements and methodology prescribed by § 304(b). Cf. E. I. duPont de Nemours & Co. v. Train, supra, 430 U.S. at 121, 97 S.Ct. 965. "The Act's text and its legislative history make clear that as a general matter the section 304(b)(1) guidelines and the section 301(b)(1) limitations were to be developed prior to the issuance of permits." Natural Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 327, 510 F.2d 692, 707 (1975). The subsequent issuance of individual NPDES permits by state authorities would then serve "to transform generally applicable effluent limitations . . . into the obligations . . . of the individual discharger . . . ." EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).
 
 
 34
 We accordingly agree with the Court of Appeals for the Sixth Circuit that "(t) he presence within the Act of successive deadlines for promulgation of standards, issuance of permits, and conformance with effluent limitations bespeaks a rational implementation strategy anticipating a discrete sequence of events(.)" Republic Steel Corp. v. Train, 557 F.2d 91, 95 (6th Cir. 1977). Although Congress intended that dischargers of pollutants be required to achieve effluent reductions applying the best practicable control technology currently available (as indicated by § 301(b)(1)(A)), it elected to require that such a result be achieved through a complex administrative mechanism which contemplates the formulation by the Administrator of regulations developed under § 304(b)(1)(A) expressing such effluent limitations as general standards applicable to classes and categories of point sources prior to the transfer of the permitting authority to the states and thus necessarily prior to the Administrator's exercise of the veto power conferred by § 402(d).
 
 
 35
 In light of the regulatory sequelae envisioned by the Act, it follows that Scott cannot now be made procedurally whole at the hands of the district court. Since Congress intended the Administrator to formulate uniform effluent limitation standards expressed as BPT on an industry-wide basis by means of rule making proceedings, any attempt at judicial repair through an evidentiary proceeding in the district court of the Administrator's error in objecting to the Anacortes permit on the basis of an ad hoc determination of what constitutes BPT for the Anacortes plant would be manifestly inconsistent with the statutory scheme.
 
 
 36
 In the absence of a valid objection under § 402(d), the compliance order issued by the Administrator requiring Scott to submit a plan designed to achieve effluent reductions based on the Administrator's unilateral determination of BPT at Anacortes is without statutory warrant.
 
 
 37
 The petitions in Nos. 75-2479 and 75-2494 are dismissed for lack of jurisdiction; the judgment in No. 76-1305 is reversed, and the matter is remanded to the district court for entry of judgment consistent with this opinion.
 
 
 38
 No party shall recover costs.
 
 
 
 [1]
 The three matters are designated in this court as Nos. 75-2479, 75-2494 and 76-1305
 Nos. 75-2479 and 75-2494 are petitions filed originally in this court by the State of Washington and Scott Paper Company, respectively, to secure review of the Administrator's action.
 No. 76-1305 is an appeal by Scott, plaintiff below, from a judgment of the district court dismissing its suit on the grounds of lack of subject matter jurisdiction.
 They have been consolidated for disposition.
 
 
 [2]
 Hereafter the "FWPCA" or the "Act"; references throughout to section numbers are to those in the uncodified version of the Act
 
 
 [3]
 The Administrator of EPA has delegated his veto power under § 402(d)(2)(B) to the Regional Administrators (40 C.F.R. § 125.5(a)(4)); for convenience, however, we speak of the Administrator throughout this opinion
 
 
 [4]
 It is perhaps well to add that § 402(b) of the Act makes provision for a state, upon meeting certain criteria and securing the Administrator's approval, to itself issue the requisite NPDES permit. The philosophy of Congress was that the states should have "the primary responsibilities and rights" to control water pollution (§ 101), and should play "a major role in the administration" of the NPDES permit program. S.Rep.No.92-414, 92d Cong., 1st Sess., 71 (1971), reprinted in 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1489 (1973); U.S.Code Cong. & Admin.News 1972, p. 3668. Thus a permit issued under a duly certified state NPDES program is neither a usurpation of federal power nor a nullity
 Here it is not disputed that DOE, in line with § 402(b) and sometime before issuing the NPDES permit to Scott, had duly submitted its own permit program together with implementing regulations to the Administrator and secured from him authorization to issue permits "for discharges (of pollutants) into the navigable waters within the jurisdiction of (the) State." § 402(a)(5).
 
 
 [5]
 Section 402(d) reads as follows:
 "(d)(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.
 "(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this Act.
 "(3) The Administrator may, as to any permit application, waive paragraph (2) of this subsection."
 
 
 [6]
 The sanctions took the form of an enforcement order issued by the Administrator pursuant to § 309(a)(3) of the Act requiring Scott to submit a compliance schedule meeting EPA's best estimate of BPT at the Anarcortes plant
 
 
 [7]
 A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or many be discharged." § 502(14)
 
 
 [8]
 Proposed effluent guidelines and standards (see E. I. duPont de Nemours & Co. v. Train, supra, 430 U.S. at 124 and n. 13, 97 S.Ct. at 973) applicable to the pulp, paper and paperboard point source category were subsequently published in the Federal Register. 41 Fed.Reg. 7661 (February 19, 1976)
 
 
 [9]
 The subsection reads in pertinent part as follows:
 "(b) In order to carry out the objective of this Act there shall be achieved . . .
 "(1)(A) not later than July 1, 1977, effluent limitations for point sources . . . (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act . . . ."
 
 
 [10]
 Section 304(h) provides:
 "(h) The Administrator shall (1) within sixty days after the enactment of this title promulgate guidelines for the purpose of establishing uniform application forms and other minimum requirements for the acquisition of information from owners and operators of point-sources of discharge subject to any State program under section 402 of this Act, and (2) within sixty days from the date of enactment of this title promulgate guidelines establishing the minimum procedural and other elements of any State program under section 402 of this Act which shall include:
 "(A) monitoring requirements;
 "(B) reporting requirements (including procedures to make information available to the public);
 "(C) enforcement provisions; and
 "(D) funding, personnel qualifications, and manpower requirements (including a requirement that no board or body which approves permit applications or portions thereof shall include, as a member, any person who receives, or has during the previous two years received, a significant portion of his income directly or indirectly from permit holders or applicants for a permit)."
 
 
 [11]
 Citations to the legislative history are to Senate Committee on Public Works, A Legislative History of the Water Pollution Control Act Amendments of 1972, prepared by the Environmental Policy Division of the Congressional Research Service of the Library of Congress (Comm. Print 1973)
 
 
 [12]
 It is not disputed that the interim guidance documents employed by the Administrator in concluding that the Anacortes permit was objectionable were internally developed by EPA without having been subjected to public review and comment as required by the rule making provisions of the APA, 5 U.S.C. § 553