**PACIFIC LEGAL FOUNDATION, a nonprofit California Corporation, John B. Kilroy, Sr., and City of Torrance, a Municipal Corporation, Petitioners,**

v.

**Douglas M. COSTLE, in his official capacity as Administrator of the United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents.**

**The CITY OF LOS ANGELES, a Municipal Corporation, Petitioner,**

v.

**Douglas M. COSTLE, in his official capacity as Administrator of the United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents.**

Nos. 77–2909, 77–3008.

United States Court of Appeals, Ninth Circuit.

Aug. 9, 1978.

Rehearing and Rehearing En Banc Denied Nov. 24, 1978.

Robert K. Best (argued), Sacramento, Cal., Frederick N. Merkin, Deputy City Atty. (argued), Los Angeles, Cal., for petitioners.

Anthony O. Garvin (argued), Appellate Section Lands & Nat'l Resources Div., Dept. of Justice, Washington, D. C., for respondents.

Before MERRILL and SNEED, Circuit Judges, and EAST,* District Judge.

SNEED, Circuit Judge:

This case presents a challenge to the Environmental Protection Agency's (EPA) action in extending the terms of the National Pollutant Discharge Elimination System (NPDES) permit applicable to the Hyperion Wastewater Treatment Plant in Los Angeles for an additional two and one-half years. Petitioner City of Los Angeles argues that the State of California, not the EPA, has jurisdiction over the discharges in question and that the joint permitting procedure used by the state and the EPA is not authorized by the statute. Petitioner Pacific Legal Foundation (PLF) initially questions EPA authority to extend the expiration date of an NPDES permit. PLF also argues that the extension process was procedurally inadequate because no hearing was held and that the Administrator's action in extending the permit was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. We have carefully considered these challenges, but must reject most of them. We do, however, remand this proceeding to the Administrator for an adjudicatory hearing as required by the Administrative Procedure Act (APA), 5 U.S.C. §§ 554, 556 and 557, with respect to EPA's extension of the NPDES permit.

## I.

### Background.

A. Statutory Framework.

The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq., (FWPCA) provide that the discharge of any pollutant shall be unlawful except as in compliance with the specific requirements of the act. Section 301, 33 U.S.C. § 1311. The statute also specifically provides that obtaining an NPDES permit authorizes such discharge. Section 402, 33 U.S.C. § 1342. The FWPCA further allows the states to assume responsibility for granting NPDES permits for discharges into navigable waters within the state's jurisdiction. Section 402(b).

These NPDES permits can only be obtained if the resulting discharge will meet other applicable requirements of the FWPCA. One of these requirements is that publicly-owned treatment works achieve effluent limitations based upon secondary treatment by July 1, 1977. Section 301(b)(1)(B). Ocean discharges are further

* Hon. William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

required to be in compliance with guidelines developed by the EPA after consideration of a wide range of environmental, health, esthetic, recreational and economic values. Section 403, 33 U.S.C. § 1343. Disposal of sewage sludge which would result in any pollutant from such sewage sludge entering the navigable waters is also prohibited except pursuant to a permit. Section 405(a), 33 U.S.C. § 1345.

B. Physical Setting.

Sewage from Los Angeles is processed at the Hyperion Wastewater Treatment Plant and the resulting products are discharged into the Pacific Ocean. Most of the sewage receives only primary treatment; the resulting effluent is discharged into the ocean through an outfall extending five miles into the Pacific. About one-third of the sewage is given additional secondary treatment and the resulting sludge is discharged through a seven mile long outfall. A third outfall of one mile is used only in emergencies.

C. Administrative Action.

On March 26, 1973, the EPA and the California State Water Resources Control Board entered into an understanding which gave the state primary responsibility for administering the NPDES program in California, but allowed the EPA to retain jurisdiction over discharges beyond the limits of the three-mile territorial sea. *See* p. 655 (slip op. p. 2596) *infra.* The initial NPDES permit for the Hyperion plant was jointly issued by the EPA and the California Regional Water Quality Control Board, Los Angeles Region (CRWQCB). This permit, issued after a public hearing, authorized discharges from the one and five mile outfalls on the condition that effluent limitations based on full secondary treatment be attained by October 1, 1979. On August 18, 1975, a new permit was jointly issued which authorized discharges from all three outfalls. The 1974 permit was explicitly rescinded at this time. The new permit retained the compliance schedules designed to achieve full secondary treatment of wastewater and added a compliance schedule designed to eliminate all ocean discharge of sewage sludge within thirty months after concept approval of a plan for alternate disposal of the sludge. Conditional approval of the use of the Palos Verdes landfill as an alternate disposal site was given by the EPA on October 11, 1975.

During the next two years the CRWQCB, apparently acting alone, amended the compliance schedule contained in the 1975 permit three times. The first change was to insert definite dates in the sludge-out compliance schedule, with elimination of sludge discharge into the ocean required by April 1, 1978. After the city missed the first interim deadlines in early 1976, the compliance schedule was again amended by the state to delay final elimination of sludge discharge until April 1, 1980. The final change, made in late 1976, merely extended one of the interim dates in the compliance schedule, while retaining April 1980 as the ultimate sludge-out date.

On July 29, 1976, the EPA notified the City of Los Angeles that the NPDES permit for Hyperion would expire on February 1, 1977 and that a new permit would have to be obtained if discharges were to continue past that date. On July 30, 1976, the city submitted an application for a new permit to the CRWQCB. A duplicate copy of this application was sent to the EPA. However, on January 24, 1977, after a public hearing, the EPA and the CRWQCB jointly changed the expiration date of the existing permit from February 1, 1977 to June 30, 1977. The stated reason for the extension was that adequate review time for a new permit was not available. The record also indicates that both agencies were aware of action in Congress which might extend the compliance dates applicable to this project. The extension was seen as a way of avoiding issuing a new permit that might be quickly outdated by changes in the underlying law.

Prior to the extension of the permit expiration date to June 30, 1977, petitioner PLF had written to the Regional Administrator of the EPA protesting the secondary treatment and sludge-out requirements in the

Hyperion permit. This letter asserted that the EPA was misinterpreting the requirements of the FWPCA and that a proper interpretation required that ocean discharge limitations be imposed only after a complete environmental, economic, and social assessment of the factors involved. This letter did not include any specific objection to the proposed extension of the permit, but instead objected generally to the existing permit conditions. The EPA responded to this letter after the January 24, 1977 extension had been granted, saying that it still held to its interpretation of the FWPCA and therefore would not change any of the permit conditions.

By the end of April 1977 the EPA had decided to extend the existing permit until December 17, 1979. The City of Los Angeles was notified of this proposal and a general public notice was published in the Los Angeles Times. PLF, because it had not specifically requested to be on the mailing list for notice of proposed action regarding the Hyperion plant, did not receive individual notice of this proposal. No written objections to the extension were filed nor was a public hearing requested. On May 23, 1977, at a public hearing, the CRWQCB officially extended the expiration date of its permit until December 17, 1979. The EPA permit was officially extended on June 2, 1977 with no further public notice or hearing. Petitioner Kilroy requested an adjudicatory hearing on the permit extension on June 13, 1977. The EPA denied this request because it found that no factual questions suitable to resolution at an adjudicatory hearing were presented by the request. The legal questions raised by Kilroy regarding the proper interpretation of the FWPCA were certified to the EPA General Counsel. EPA's legal position was set forth in a memo from the General Counsel issued on October 18, 1977.

On August 18, 1977, a petition for review of the Administrator's action was filed in this court by PLF and Mr. Kilroy. A similar petition was filed by the City of Los Angeles on August 31, 1977. These petitions were consolidated by order of this court on December 23, 1977. That order also stayed the terms, conditions and requirements of the permit pending final disposition of these consolidated cases.

## II.

### *Appellate Court Jurisdiction.*

A. Modification or Issuance.

██ We are faced initially with the question of whether we have jurisdiction to hear this case. Section 509(b)(1)(F) of the FWPCA, 33 U.S.C. § 1369(b)(1)(F), provides that "review of the Administrator's action in *issuing or denying* any permit under section 402 may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business" (emphasis added). The Administrator's *extension* of the expiration date of a permit clearly is not *expressly* included in the list of reviewable actions.

Section 509 generally has been strictly construed. The Second Circuit has held that it does not grant jurisdiction to review state action in issuing or denying an NPDES permit under section 402(b). *Mianus River Preservation Committee v. EPA,* 541 F.2d 899 (2d Cir. 1976). Both this Circuit and the Fifth Circuit have held that the Administrator's action in vetoing or failing to veto a permit granted by a state does not come within the scope of the term "issuing or denying any permit." *State of Washington v. EPA,* 573 F.2d 583 (9th Cir. 1978); *Save the Bay, Inc. v. EPA,* 556 F.2d 1282 (5th Cir. 1977). Focusing on the fact that section 509 provides only for review of the Administrator's action, the *Mianus River* court held that since the permitting action involved in that case was carried out solely by the state, there was no action by the Administrator to review. Both *State of Washington* and *Save the Bay* reasoned that section 509 applies only to direct permitting activities of the Administrator and not to his discretionary review of state permitting decisions.

Here the question is different. The action is that of the Administrator and consists of extending a permit. As will appear in Part II.B. of this opinion, this extension by the Administrator is more than failing to veto the state-granted extension. The critical issue, as we see it, is whether for the purposes of section 509(b)(1)(F) an extension amounts to an issuance. We know of no authority directly in point nor is the legislative history helpful. The proper resolution, we believe, is to treat a permit extension the same as a permit issuance. Functionally, there is no difference between reissuance of a permit for a certain period from the date of its expiration and an extension of the same permit for the same period. Therefore, we hold that we have jurisdiction under section 509(b)(1)(F) to review the Administrator's action in extending the permit.

This holding is a narrow one; it is not intended to suggest that any modification of an existing permit amounts to an issuance of the entire permit for the purposes of section 509(b)(1)(F). Modification alters the meaning and scope of only those provisions modified; extension affects all provisions by projecting their life.

An extension remains an issuance even when accompanied by modifications authorized by section 402(a)(3), 33 U.S.C. § 1342(a)(3); such modifications, however, when unaccompanied by an extension are not an issuance. The hallmark of issuance is its projection into the future beyond the reach of an existing permit. Modifications do not so project. In this manner a section 402(a)(1) issuance can and should be distinguished from a section 402(a)(3) modification.

Therefore, we repeat, the June 2, 1977 permit extension by the EPA was the *issuance* of a permit for the purposes of section 509(b)(1)(F).

**B. Authority of EPA to Extend Permit.**

■ Although the EPA in fact granted an extension of the permit, which for purposes of section 509(b)(1)(F) we are prepared to treat as an issuance, the City of Los Angeles sharply challenges the authority of the EPA to so issue such permit. It contends that authority to issue permits such as that with which we are concerned has been delegated to the State of California under section 402(b) of the FWPCA, 33 U.S.C. § 1342(b), and that, as a consequence, the sole juridically effective extension was accomplished by the state. Under these circumstances, *State of Washington, supra,* and *Mianus River, supra,* would deprive this court of jurisdiction to review state action under section 509(b)(1)(F).

The flaw in this argument, however, is that the state's extension was not the only juridically effective extension. The permit, as extended, applies to discharges *beyond* the "territorial seas," defined in section 502(8), 33 U.S.C. § 1362(8), as "the belt of the seas . . . extending seaward a distance of three miles." We hold that only the Administrator has authority to grant permits to such areas. Therefore, even if the Administrator's power over those portions of the permit applicable to navigable waters within the "territorial seas" is limited to vetoing state action, *State of Washington, supra* at 586–87, the permit extension, to be juridically effective in its entirety, requires additional action by the Administrator. This action is subject to review because, within the limits of the Administrator's power, all provisions of the permit were reissued by the extension.

Our holding that only the Administrator has authority to grant permits beyond the "territorial seas" is required by the FWPCA. Section 402(b), 33 U.S.C. § 1342(b), authorizes a state "desiring to administer its own permit program for discharges into *navigable waters* within its jurisdiction" (italics supplied) to submit such a program to the Administrator for approval. The legislative history of the FWPCA makes clear that Congress intended for the states to be the primary permitting authority. Section 101(b), 33 U.S.C. § 1251(b); A Legislative History of the Water Pollution Control Act Amendments of 1972, Serial No. 93–1, 93rd Cong., 1st Sess. (1973) Vol. 1 at 262 (hereinafter Leg.

History). Nonetheless, "navigable waters" is defined to mean "waters of the United States, including the territorial seas," section 502(7), 33 U.S.C. § 1362(7), but not including explicitly either the "contiguous zone" or the "ocean," both of which, under the definitions of the FWPCA, occupy areas beyond the "territorial seas."

The "contiguous zone" embraces "the entire zone established or to be established by the United States under article 24 of the Convention of the Territorial Sea and the Contiguous Zone." Section 502(9), 33 U.S.C. § 1362(9). Article 24 of the Convention describes the "contiguous zone" as "a zone of the high seas contiguous to its territorial sea . . . ." 15 United States Treaties and Other International Agreements, Part 2, 1612 (1964). Finally, "ocean" is defined by the FWPCA to mean "any portion of the high seas beyond the contiguous zone." Section 502(10), 33 U.S.C. § 1362(10). These two areas, the "contiguous zone" and the "ocean," clearly extend beyond the "navigable waters," the outer limits of which mark the extent of the power of the states to administer their own permit programs. Had Congress intended the power of the states to extend beyond the territorial seas it easily could have so provided. Having not done so, we can hold only as we have indicated. Beyond the territorial seas only the Administrator, we repeat, has authority to issue permits.

Our conclusion is further strengthened by the FWPCA's definition of the EPA's permit granting authority. The Administrator is authorized "[to] issue a permit for the discharge of any pollutant." Section 402(a)(1), 33 U.S.C. § 1342(a)(1). The term "discharge of a pollutant" is thereafter defined to mean "(A) any addition of any pollutant to *navigable waters* from any point source, (B) any addition of any pollutant to the waters of the *contiguous zone* or the *ocean* from any point source other than a vessel or other floating craft." (Italics supplied). Section 502(12), 33 U.S.C. § 1362(12). Again it is apparent that "ocean" and "contiguous zone" waters are

not included within the scope of the term "navigable waters" as it is used in the FWPCA and therefore cannot be required by the state. Federal action is required.

Our view regarding the scope of the state's permitting authority is also supported by the legislative history. Section 402(a)(5), 33 U.S.C. § 1342(a)(5), provides authorization for states to grant permits on an interim basis "for discharges into the navigable waters within the jurisdiction of such State." This description of the scope of state permitting authority is similar to the state authority granted by section 402(b) on a permanent basis. In the Report of the House Committee on Public Works, the subsection (a)(5) permit authority is limited to "discharges into the navigable waters within the jurisdiction of such State (but not in the contiguous zone or the ocean)." Leg.History at 813. Congress, no doubt, intended a similar limitation on state jurisdiction under section 402(b).

This conclusion is not undermined by section 402(c) which provides for the suspension of EPA permitting authority once a state permit program is authorized. The suspension affects only that which the state is permitted to exercise. *EPA v. State Water Resources Control Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) is relevant. There the Supreme Court ruled that state permitting authority did not extend to discharges from federal installations located in the state. The Court rejected an argument that section 402(c) necessarily required the EPA to suspend completely the issuing of permits for discharges in that state. *Id.* at 224–26 n. 39, 96 S.Ct. 2022. The Court found that since Congress did not intend for the states to have permitting authority over federal installations, permit authority over those installations should remain with the EPA. Similarly here, inasmuch as Congress did not intend for state jurisdiction to apply to discharges past the three-mile territorial sea, it is appropriate to hold that the EPA retains jurisdiction to grant permits for such discharges.[1]

1. Petitioners point out the extensive debate in Congress over the interaction between the

FWPCA and the Marine Protection, Research and Sanctuaries Act of 1972. They argue that

Inasmuch as the Administrator's June 2, 1977 action amounted to the issuance of a valid permit, we hold that under section 509(b)(1)(F) we have jurisdiction to consider the petitions before us.

## III.

### Federal-State Coordination of Permit Actions.

█ Our analysis results in the EPA retaining jurisdiction over both the five and seven mile outfall discharges, while the State of California has permitting authority over the one mile emergency outfall because it is within the three-mile territorial sea. Joint action seems the most sensible way of dealing with the problems created by this splitting of jurisdiction. We find nothing in the legislative history to suggest that such joint action is contrary to Congressional intent. On the contrary, there is strong support in the legislative history for a conclusion that Congress wanted to encourage a federal-state partnership for the control of water pollution. Leg.History at 1279 (comments of Senator Montoya).

The Supreme Court in *EPA v. State Water Resources Control Board, supra,* recognized that problems of coordination might result from allowing both the EPA and the state to issue permits for discharges within the state. This did not impel the Court to alter its conclusion. It observed that "these possible problems of coordination . . . fail to provide an adequate basis for finding a clear congressional intention to subject federal dischargers to the degree of control inherent in adhering to state permit requirements . . . ." *Id.* at 221, 96 S.Ct. at 2032. Similarly here, we recognize the problems involved in coordinated action; nevertheless, we cannot hold under the terms of the FWPCA that joint action is improper and that all authority must be turned over to the state to avoid conflicts.

since the FWPCA controls all discharges from outfall pipes, no matter how far out into the ocean the pipe extends, while the MPRSA covers all other ocean dumping, all jurisdiction retained in the FWPCA should be delegable to

Joint action in this particular case is complicated by the structure of California law which in effect requires that all discharges from the Hyperion plant be covered by a state permit. The Porter-Cologne Act imposes on "[any] political agency or entity of this state discharging waste . . . outside the boundaries of the state in a manner that could affect the quality of the waters of the state" the duty to file information regarding the discharge. Calif.Water Code § 13260. Thereupon the regional water quality control boards are empowered to prescribe requirements governing the discharge. Calif.Water Code § 13263. Discharges from the five and seven mile outfalls "could affect the quality of the waters of the state"; thus, they are perhaps subject to state permitting. The extent to which, and the circumstances under which, state authority over discharges at the five and seven mile outfalls may be preempted is not an issue before us.

Here we need only point out that, given the split jurisdiction over discharges from the Hyperion plant, coordination between the federal and state authorities is imperative. The record here, despite suggestions by the petitioners to the contrary, does not reflect a contumacious refusal by either authority to recognize this necessity.

## IV.

### Availability of an "Opportunity For Public Hearing."

█ Having held in Part II of this opinion that our jurisdiction properly was invoked pursuant to section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F), it follows that our review of the extension must consider the issues that ordinarily arise on petitions to review the issuance of any permit pursuant to the authority of section 402, 33 U.S.C. § 1342.

the states. We fail to see the logic of this reasoning. The regulation of ocean dumping is totally unrelated to the specific question here being considered.

Initially, this means that the application for review must have been made within ninety days of the issuance. This requirement was met in this case. The petitions were filed on August 18 and 31, 1977, well within ninety days from the June 2, 1977 date of issuance. Next, issuance must follow an "opportunity for public hearing." Section 402(a)(1). We hold that no proper "opportunity for public hearing" was provided in this case.

The analysis supporting this conclusion must commence with *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1262 (9th Cir. 1977), in which we held that the hearing provisions of the APA, 5 U.S.C. §§ 554, 556 and 557 were applicable to the issuance of section 402 permits.[2] Section 554(c) provides:

> "The agency shall give all interested parties opportunity for—(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and (2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title."

The "opportunity" of which section 554(c) of the APA speaks is, by reason of *Marathon Oil Co. v. EPA, supra,* the "opportunity for public hearing" of which section 402(a)(1) of the FWPCA speaks.

In this case all parties agree that the EPA never conducted a hearing regarding the extension of the permit. The Administrator contends, however, that an "opportunity" was provided notwithstanding the absence of a hearing. He points to the fact that notice of the proposed extension and the availability of a hearing was published in the Los Angeles Times. Since no one requested a hearing, EPA argues, there was not significant public interest to necessitate holding a hearing. *See* 40 C.F.R. § 125.-34(a).

■ The Administrator misconceives the showing that must be made to demonstrate that adequate opportunity for a hearing has been given. The necessity of a hearing turns not only on the vigor with which interested parties clamor for one, but also on whether a showing has been made demonstrating that a hearing is unnecessary. *See United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 453 (9th Cir. 1971); *American Bancorporation, Inc. v. Board of Governors of the Federal Reserve System,* 509 F.2d 29, 37–38 (8th Cir. 1974). We find persuasive the observations of the court in *Independent Bank Ass'n of Georgia v. Board of Governors of the Federal Reserve System,* 516 F.2d 1206 (D.C. Cir. 1975) concerning the "opportunity for hearing" provision of section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c)(8). The court stated:

> "The case law in this Circuit is clear that an agency is not required to conduct an evidentiary hearing when it can serve absolutely no purpose. In such a circumstance, denial of a hearing may be proper even though adjudicatory proceedings are provided for by statute. The agency, however, carries a heavy burden of justification. Where Congress has plainly given interested parties the right to a full hearing, the agency must show that the parties can gain nothing thereby, because they disputed none of the material facts upon which the agency's decision could rest."

*Id.* at 1220.

■■ The fact that no one requested a hearing prior to the decision is appropriately considered in this analysis, but it is not decisive.[3] It must be shown that the mate-

---

**2.** Similar holdings have been made in *U. S. Steel Corp. v. Train,* 556 F.2d 822 (7th Cir. 1977) and *Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872 (1st Cir. 1978).

**3.** We recognize that *National Independent Coal Operators Association v. Kleppe,* 423 U.S. 388, 397–98, 96 S.Ct. 809, 46 L.Ed.2d 580 (1976)

suggests in dictum that a failure to request a hearing waives any right to a hearing and that the power to require a hearing by a request therefor constitutes "an opportunity" for a hearing. That case, however, involved the assessment of penalties against coal mine operators found to have unsafe conditions in their mines pursuant to the Federal Coal Mine

rial facts supporting the decision are not subject to dispute.[4] We realize that this is a not inconsiderable burden to place on the agency, but it is appropriate in view of the strong policy in favor of holding public hearings before an adjudicative decision is made. *Marathon Oil, supra* at 1261–62.

█ We cannot say a hearing prior to the June 2, 1977 extension would have served "absolutely no purpose" nor can we say that a hearing subsequent to a remand of this case would be futile. We reach this conclusion after assuming, *arguendo*, that section 301 of the FWPCA, 33 U.S.C. § 1311, requires the elimination of the discharge of sludge in the ocean and that the water pollution problems of disposal of sludge on land have been made a responsibility of the State of California pursuant to the section 402(b) delegation discussed in Part II.B., *supra*. See *Pacific Legal Foundation v. Quarles*, 440 F.Supp. 316 (C.D.Ca.1977). Nonetheless, inasmuch as the permit given by the EPA and reissued by its letter of June 2, 1977 inevitably required cooperation between the EPA and the state with respect to the EPA's termination of the discharge of sludge in the ocean and its disposal by the state on the land, it is apparent to us that the reasonableness of the EPA's compliance schedule depends upon facts that may be disputed and with respect to which the record in this case is silent. Such facts as the adequacy of the Palos Verdes or other landfill site, the ability of the city to acquire the capacity to transport the sludge within the time limits fixed by the permit, and the possible effect on navigable waters of land disposal are relevant to determining whether the sludge-out compliance schedule is supported by "substantial evidence." 5 U.S.C. § 706(2)(E) (1970).

Yet, on this record we can conclude unequivocally neither that the parties have no dispute about these matters nor that they do. Under these circumstances we are unable to deny an adjudicatory hearing on the ground that none of the material facts upon which the EPA's decision rests are disputed. Although ordinarily we might conclude that a silent record reflects no disagreement as to material facts, the special circumstances of this case cautions us against that course here. We acknowledge that, should a showing on remand be made in a proper manner that no dispute as to material facts exists, it would be necessary for us to reconsider our holding that no "opportunity for hearing" was provided.

Among the special circumstances of this case is the division of jurisdiction over discharges in the ocean between the federal and state authorities which significantly complicates compliance by an affected agency. It becomes both possible and

Health and Safety Act of 1969. The failure of the operator in that situation to object to the fine almost inevitably leads to the conclusion that he is not disputing any of the facts underlying the action. In the case before us, while the failure of the city to request a hearing may suggest that it does not contest any of the facts supporting the issuance of the permit, the failure of PLF and Kilroy to request a predecision hearing does not lead to the same conclusion. Newspaper notice may not reach all interested parties. Interested citizens may not realize that they need to request a hearing if they are interested in an issue. Particularly in light of the known public opposition to use of the Palos Verdes landfill, we are unwilling to say that the mere failure to request a predecision public hearing is decisive of the question whether a hearing need be held.

4. The Supreme Court has held that in some situations the burden of demonstrating that there are disputed issues of material fact may be placed on the party challenging the agency's action. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 620, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). These cases are inapposite here, however, because they involved situations in which established regulations clearly applied to preclude the petitioner's argument from succeeding. In such a situation, placing the burden on the petitioner to show in fairly precise terms why a particular exception should be made will save the agency from having to conduct full evidentiary hearings only to deny routinely the application of the challenging petitioner for failure to meet an initial prerequisite. In the case before us, however, there is no such established rule setting forth specific prerequisites to a hearing. Whether an adequate "opportunity" has been provided must turn on a more subtle analysis of the entire situation.

tempting for each authority to deny responsibility by attributing the command in question to the other. The ease with which this can be done increases as the opportunities for confrontation in a hearing setting diminish. Considerations such as these may properly influence our decision about whether a hearing in the situation before us would be useless.

We also note that petitioner Kilroy requested an adjudicatory hearing pursuant to 40 C.F.R. § 125.36 ten days after the decision to extend the permit was announced. A hearing allowing for reconsideration of the decision is clearly preferable to no hearing at all.

Finally, we are influenced by the fact that the record before us is barren of any explanation of the extension of June 2, 1977. Even if this were treated as a "modification" of a pre-existing permit under section 402(a)(3), we would confront a serious problem in determining whether the extension was arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). An adjudicatory hearing undoubtedly will yield a record that will provide the reasons for the extension.

## V.

*Absence of Ocean Discharge Guidelines.*

 Before framing our remand of this case we must consider the petitioner's contention that the extension of the permit was invalid because it occurred at a time during which no guidelines established under section 403(c) of the FWPCA, 33 U.S.C. § 1343(c) existed. Section 403(a) provides:

"No permit under section 402 of this title for a discharge into the territorial sea, the waters of the contiguous zone, or the oceans shall be issued, after promulgation of guidelines established under subsection (c) of this section, except in compliance with such guidelines. Prior to the promulgation of such guidelines, a permit may be issued under such section 402 of this title if the Administrator determines it to be in the public interest."

At the time the original permit was issued ocean discharge guidelines were in effect. These were rescinded on January 11, 1977 and new guidelines did not exist on June 2, 1977. The original permit was in compliance with the then existing guidelines.

Petitioners contend, and we agree, that the last sentence of section 403(a) does not provide the answer to their assertion of invalidity. This sentence is specifically designed to cover only the period before the promulgation of the initial guidelines. Leg. History at 324. The problem we confront is different. Specifically, it is whether a permit, issued in compliance with then existing guidelines, validly can be reissued at a time during which the previous guidelines have been withdrawn for revision. We hold such reissuance to be valid. It is, by relation back to the original issuance, "in compliance with such guidelines" as the statute requires. We need not consider in this case the circumstances under which relation back becomes improper because of the extensive modifications that accompanied the extension. At some point an "extension" may become an original issuance rather than a reissuance. Such circumstances do not exist here, however.

## VI.

*The Remand.*

The absence of a proper hearing requires us to remand this proceeding to the Administrator to conduct such a hearing.

This Court, by an order of December 23, 1977, stayed the NPDES permit pending the disposition of this case. Our order provided that the "terms, conditions and requirements" of the NPDES permit applicable to the Hyperion Treatment Plant are stayed with the "exception that effluent limitations which were applicable to the Hyperion Plant and which were in effect for the discharges from the Hyperion Plant on January 1, 1977, and monitoring and reporting requirements related thereto shall remain in effect to maintain the *status quo* and to ensure continued protection of the marine environment." This stay, again

subject to the above exception, is continued pending a proper hearing. It shall terminate at such time following the hearing as the Administrator promulgates a new permit, extends that in effect on January 1, 1977, or terminates the permit.

REMANDED.