QUESTION PRESENTED AND CONCLUSION
The U.S. Environmental Protection Agency ("EPA" or "the Agency") is the federal agency responsible for delegation of environmental programs to the states. The EPA has expressed the opinion that Colorado can no longer meet delegation requirements because of the self-audit law. Specifically, the Agency has stated that Colorado's self-audit law deprives the State of the ability to effectively administer the National Pollutant Discharge Elimination System ("NPDES") program under the Clean Water Act ("CWA").[2] Although the focus has been on the CWA, EPA has also expressed concerns that the self-audit law impacts Colorado's ability to carry out environmental programs under the Clean Air Act ("CAA") and the Resource Conservation and Recovery Act ("RCRA"). (For convenience, we will refer to the environmental programs delegated under the CWA, CAA, and RCRA collectively as "the environmental programs").
The issue we address here, then, is whether the self-audit law prevents Colorado from meeting federal requirements for delegation of environmental programs under the Clean Water Act's NPDES program, the Clean Air Act's Title V program, and the Resource Conservation and Recovery Act's Hazardous Waste Management program.[3] Various parties have raised other issues of statutory application and intent regarding the self-audit law. We do not address those issues here. To the extent that they have not been resolved elsewhere, this office can issue additional memoranda concerning those questions. See, e.g., Letter from Gale A. Norton, Colorado Attorney General, to William Yellowtail, EPA (Nov. 18, 1997) (attached hereto).
We have reviewed the federal requirements for delegation of environmental programs to the states and have determined that the self-audit law does not impact Colorado's legal authority to meet those requirements. The EPA has expressed concerns about both the privilege and immunity provisions of the self-audit law. Our analysis, however, reveals that the law does not in any way change or diminish the authority of the State to obtain the records required to be made available to the State under the environmental statutes it implements. Further, the decision of the State Legislature to codify prosecutorial discretion to allow limited immunity from certain penalties does not violate delegation requirements, as properly interpreted by the EPA itself.
 ANALYSIS I. THE PRIVILEGE PROVISIONS OF THE SELF-AUDIT LAW DO NOT AFFECT THE STATE'S ABILITY TO MEET DELEGATION REQUIREMENTS
The self-audit law allows a privilege for self-critical analysis done in a voluntary self-evaluation of an entity's environmental compliance. See § 13-25-126.5(3), C.R.S. (1998). The privilege does not apply to documents or information required to be developed, maintained, reported, made available, or furnished under any environmental or other law. See §13-25-126.5(4)(a) (b), C.R.S. (1998). In short, the self-audit law does not impact Colorado's authority to secure records to the extent those records are required to be made available to the State under the environmental laws.
 A. Federal Delegation Requirements
The CWA, CAA, and RCRA require states to meet minimum statutory and regulatory standards for delegation. See 33 U.S.C. § 1342(b),40 C.F.R. Part 123 [CWA]; 42 U.S.C. § 7661a(b),40 C.F.R. Part 70 [CAA]; 42 U.S.C. § 6926(b),40 C.F.R. Part 271 [RCRA].
The CWA provides that, in order to obtain delegation, a state must have authority: "To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title." 33 U.S.C. § 1342(b)(2)(B) (emphasis added). The referenced section 1318 provides, in relevant part:
 (a) Whenever required to carry out the objective of this chapter . . .
 (4)(A) the Administrator shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods . . . (iv) sample such effluents . . . and (v) provide such other information as he may reasonably require; and
 (B) the Administrator or his authorized representative . . . (i) shall have a right of entry to, upon, or through any premises in which an effluent source is located or in which any records required to be maintained under clause (A) of this subsection are located, and (ii) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under clause (A), and sample any effluents which the owner or operator of such source is required to sample under the clause.
33 U.S.C. § 1318(a)(4)(A-B) (emphasis added).[4] Thus, states must have the authority to require records necessary to carry out the objectives of the CWA.
The CAA and RCRA have information-gathering requirements similar to those in the CWA. Under the permit provisions of Title V of the CAA, EPA is given authority to promulgate monitoring and reporting requirements for states. See 42 U.S.C. § 7661a. The EPA did promulgate regulations setting forth in great detail the record-keeping requirements that states must place in permits. See 40 C.F.R. § 70.6.
Under RCRA, the states must have authority to require persons who generate, store, treat, transport, dispose, or handle hazardous wastes to furnish information related to such wastes and to permit inspectors to copy "all records relating to such wastes." 42 U.S.C. § 6927(a). Information-gathering regulations under RCRA parallel the wording of the CWA regulations. See 40 C.F.R. § 271.15.
Upon a showing that the state meets these requirements, EPA must approve the state's program. See 33 U.S.C. § 1342(b) [CWA];[5] Save the Bay v. U.S. Environmental ProtectionAgency, 556 F.2d 1282, 1285 (5th Cir. 1977). According to section 1318(c) of the CWA:
 Each State may develop and submit to the Administrator procedures under State law for inspection, monitoring, and entry with respect to point sources located in such State. If the Administrator finds that the procedures and the law of any State relating to inspection, monitoring, and entry are applicable to at least the same extent as those required by this section, such State is authorized to apply and enforce its procedures for inspection, monitoring, and entry with respect to point sources located in such State (except with respect to point sources owned or operated by the United States).
33 U.S.C. § 1318(c).
In summary, states must have the same information-gathering authorities within their regulatory frameworks as the EPA. Specifically, states must be able to require records necessary to carry out the various environmental programs.
 B. Colorado Compliance with Federal Requirements
Colorado fulfilled all the requirements for delegation of the NPDES program and received EPA approval to administer the program in 1975. See Colorado Water Quality Control Act, §§25-8-101 to -703, C.R.S. (1998). The State has interim approval for delegation of the permitting authorities under Title V of the Clean Air Act. See Colorado Air Pollution Prevention and Control Act, §§ 25-7-101 to -137, C.R.S. (1998). EPA delegated authority to Colorado to administer RCRA's Hazardous Waste Management program in November 1984. See §§ 25-15-301 to -316, C.R.S. (1998).
Under the Colorado environmental statutes, as they exist now and as they existed at the time of delegation approval, the State may enter and copy records required to be kept by a regulated entity. See § 25-8-306(1), C.R.S. (1998) [CWA]; §25-7-111(2)(c), C.R.S. (1998) [CAA]; § 25-15-301(3), C.R.S. (1998) [RCRA]. EPA contends, however, that Colorado no longer meets the delegation requirements under the federal environmental statutes because of the privilege provisions of the self-audit law. To the contrary, we conclude that the self-audit law does not in any way deprive Colorado of the information-gathering authority necessary to carry out the objectives of the CWA and the other federal environmental statutes.
The self-audit law grants a narrowly constructed privilege for an environmental audit report defined as "any document, including any report, finding, communication, or opinion or any draft of a report, finding, communication, or opinion, related to and prepared as a result of a voluntary self-evaluation that isdone in good faith." § 13-25-126.5(2)(b), C.R.S. (1998) (emphasis added). To successfully claim the privilege, a person or entity must perform the self-evaluation voluntarily and in good faith. See id. A voluntary self-evaluation is further defined as being self-initiated, not required by an existing legal duty, and completed within a reasonable time period. See
§ 13-25-126.5(2)(e), C.R.S. (1998).
We have interpreted the self-audit law as protecting only the self-critical analysis in the audit, and not underlying facts. See Letter from Gale A. Norton, Colorado Attorney General, to William Yellowtail, EPA (Nov. 18, 1997). Thus, if an audit report cites to the fact that a holding tank is twenty-five years old, that fact is not privileged. The analysis that the tank should be replaced within ten more years, if not otherwise required to be reported, is privileged. The privilege, then, is narrow in that it applies only to self-critical analysis that would not exist absent an audit. In short, regulators can get any information they otherwise could have gotten before the self-audit law. The self-audit law merely encourages analysis that might not have been done absent some protection.
Also important for a legal analysis of the State's ability to meet federal delegation requirements regarding information-gathering are the broad exemptions to the privilege. As set out in the self audit law, the privilege does not apply in six identified areas:
 (a) Documents or information required to be developed, maintained, or reported pursuant to any environmental law or any other law or regulation;
 (b) Documents or other information required to be available or furnished to a regulatory agency pursuant to any environmental law or any other law or regulation;
 (c) Information obtained by a regulatory agency through observation, sampling or monitoring;
 (d) Information obtained through any source independent of the environmental audit report or any person covered under section 13-90-107 (1) (j) (I) (A), C.R.S.;
 (e) Documents existing prior to the commencement of and independent of the voluntary self-evaluation;
 (f) Documents prepared subsequent to the completion of and independent of the voluntary self-evaluation; or
 (g) Any information, not otherwise privileged, including the privilege created by this section, that is developed or maintained in the course of regularly conducted business activity or regular practice.
§ 13-25-126.5(4)(a-g), C.R.S. (1998). The broadest of these exceptions are contained in subsections 4(a) and (b), which exempt from privileged status any information or documents required to be made available or furnished to a regulatory agency, or to documents or information required to be maintained, reported, or disclosed under any law. For example, if the State requires monitoring reports to demonstrate compliance with environmental requirements, monitoring data contained in those reports, even if also contained in an audit, cannot be privileged. Thus the State can get any records required to be made available under its law.
In addition, under the self-audit law, the claim of privilege can be waived, or it can be lost when a court or an administrative law judge finds through an in-camera review process that prompt action was not taken toward compliance, that there were compelling or fraudulent circumstances, or that evidence exists of a clear, present or impending danger to the public or the environment. See § 13-25-126.5(3)(a-e), C.R.S. (1998).
The above limitations on application of the self-audit privilege make it clear that the privilege is only available in certain limited circumstances. The only information that the State may not require pursuant to the self-audit law is self-evaluative analyses, as specifically defined in the statute. The State Legislature has determined that it is not necessary to have access to such information to carry out the State's environmental programs. Analogously, there are limitations on the authority of the EPA Administrator to require records. For example, EPA has authority under the CWA to obtain "information as [it] may reasonably require."33 U.S.C. § 1318(a)(4)(A)(v). EPA practice and caselaw indicate that it is not "reasonable" for a federal agency to require privileged documents.[6] The United States Supreme Court, in Upjohn Co.v. United States, 449 U.S. 383 (1981), has held that the common law attorney-client and work product privileges applied to Internal Revenue Service proceedings. See also Federal ElectionComm'n v. The Christian Coalition, 178 F.R.D. 61 (E.D. Va. 1998); United States v. Mobil Corp., 149 F.R.D. 533 (N.D. Tex. 1993) (IRS proceedings); Securities Exchange Comm'n v. Gulf andWestern Indus., Inc., 518 F. Supp. 675 (D. D.C. 1991). Just as EPA is limited in the records it may require in its own regulatory framework, the State is likewise limited by the privileges recognized in its regulatory structure.
EPA has also implied that provisions in the environmental laws referring to copying of "any records" gives the agency authority to demand and get any record at all. This is not the case, however. The phrase "copy any records," such is contained in section 1318(a)(4)(B) of the CWA, must be read in context. Section 1318(a)(4)(A) states that the Administrator, whenever required to carry out the objectives of the CWA, may require entities to maintain records and provide other information reasonably required. The authority to enter and copy records must refer back to the records and information required to carry out the program under the statute. If the phrase "copy any records" was an independent grant of unlimited authority to secure records, then the first part of the paragraph describing the records to be made available is surplusage. Also, such an interpretation would lead to an absurd result, that is, that EPA has absolutely no limitation on the records it might require. For example as explained above, the Agency could obtain attorney-client privileged documents, and certainly Congress did not intend that result.
Further, EPA recognized when it delegated the NPDES program to Colorado that the State could not copy any record maintained by a regulated entity. As noted above, EPA approved a regulatory program that limited the State's information-gathering authority to those records required to be kept. See § 25-8-306(1), C.R.S. (1998); and Letter from Russell E. Train, EPA Administrator, (March 27, 1975) (delegating authority for Colorado's administration of the NPDES program).
In conclusion to this section, we find that the self-audit law does not prevent Colorado from meeting the federal information-gathering requirements for delegation of the environmental programs to the states.
 II. THE PENALTY PROVISIONS OF THE SELF-AUDIT LAW DO NOT AFFECT THE STATE'S ABILITY TO MEET DELEGATION REQUIREMENTS
The self-audit law provides immunity from certain penalties when a regulated entity performs a self-evaluation, finds violations of environmental laws, and promptly corrects those violations. In short, the State Legislature has codified a discretionary policy of not assessing fines in such situations. The EPA expresses concerns about these provisions because, the agency contends, the provisions limit the State's legal ability
to obtain penalties for every environmental violation. EPA's concerns are not well-founded because the federal environmental statutes do not prevent the states from codifying prosecutorial discretion in the form of statutory immunity. This interpretation is supported by EPA in a number of administrative actions and, thus, is entitled to deference. See Chevron, U.S.A., Inc. v.Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43
(1984). Therefore, we conclude that the immunity provisions of the self-audit law do not impact Colorado's ability to enforce the environmental laws, as required for delegation.
 A. Federal Delegation Requirements
All of the relevant environmental statutes provide the states great flexibility in fashioning enforcement mechanisms within delegated programs. For example, in order to receive delegation under the CWA, states must have "adequateauthority . . . [t]o abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1342(b)(7) (emphasis added). Delegation regulations promulgated by EPA put into effect more stringent requirements.[7] Of specific importance here under the CWA, 40 C.F.R. § 123.27 states:
 (a) Any State agency administering a program shall have available the following remedies for violations of State program requirements:
 (3) To assess or sue to recover in court civil penalties and to seek criminal remedies, including fines, as follows:
 (i) Civil penalties shall be recoverable for the violation of any NPDES permit condition; any NPDES filing requirement; any duty to allow or carry out inspection, entry, or monitoring activities; or, any regulation or orders issued by the State Director. These penalties shall be assessable in at least the amount of $5,000 a day for each violation.
 (ii) Criminal fines shall be recoverable against any person [for willful or negligent violations].
 (b)(1) The maximum civil penalty or criminal fine (as provided in paragraph (a)(3) of this section) shall be assessable for each instance of violation and, if the violation is continuous, shall be assessable up to the maximum amount for each day of violation
40 C.F.R. § 123.27.
Delegation requirements relating to state enforcement authority in the CAA and RCRA are similar to those in the CWA. In order to delegate permitting authority to a state under Title V of the CAA, EPA must ensure that the state has authority to:
 [E]nforce permits, permit fees requirements, and the requirement to obtain a permit, including authority to recover civil penalties in a maximum amount of not less than $10,000 per day for each violation, and provide appropriate criminal penalties . . . .
42 U.S.C. § 7661a(b)(5)(E). These requirements are repeated in the Title V state delegation regulations. See40 C.F.R. § 70.4(b)(3)(vii).
Under RCRA, states must have authority to provide "adequate enforcement of compliance" with the requirements of the RCRA program. 42 U.S.C. § 6926(b). Delegation regulations promulgated under RCRA require states to have essentially the same enforcement authority as required under the CWA, except that under the CWA penalties must be available for criminal negligence, whereas RCRA contains a knowledge requirement for imposition of criminal penalties. See 40 C.F.R. § 271.16.
The EPA has expressed an opinion that the cited provisions of the various statutes and regulations require that a state seeking delegation have the authority to assess a penalty forany violation, even though it may not utilize that authority in every instance of violation. To the contrary, our review of the federal statutes and regulations indicates that these provisions require the states to have general authority to assess certain amounts of fines for particular violations; but, the provisions do not prevent states from codifying those situations in which they will not exercise that authority.
 B. Colorado's Compliance with Federal Requirements
The self-audit law provides immunity from administrative and civil penalties and penalties for criminal negligence when a regulated entity finds a violation in a self-evaluation, promptly reports the violation to the Colorado Department of Public Health and Environment (CDPHE), and works with CDPHE to correct the violation. See § 25-1-114.5(1)(a-d), C.R.S. (1998). The law does not affect the State's authority to order injunctive relief to abate or remedy the violations reported.[8] See §25-1-114.5(7), C.R.S. (1998). The immunity provisions do not apply to so-called "bad actors." See § 25-1-114.5(6), C.R.S. (1998).
In addition, immunity does not apply if a disclosure is required under a permit or order. See § 25-1-114.5(3), C.R.S. (1998). This exemption narrows the scope of violations that may receive immunity as many permits require extensive reporting of violations. For example, CDPHE places provisions in NPDES permits requiring periodic reporting of effluent results in the form of discharge monitoring reports, written notification of failures of whole effluent toxicity tests, as well as notification of noncompliance, bypasses, and upsets.[9] Under the NPDES program, then, permitted sources must report most violations under the terms of their permits. Those violations would not qualify for immunity under the self-audit law.
However, a discharge violation by an unpermitted entity, for example, would qualify for immunity. But, by reporting the violation to regulators, the entity would be required to apply for a permit, and thus, would be brought into the regulatory system. The State Legislature intended with the self-audit law to bring into the permit system those entities that had heretofore been outside of it.
Colorado's self-audit law represents a policy determination based upon the belief that encouraging voluntary compliance through certain protections furthers the primary goal of improving environmental quality.[10] The self-audit law furthers this goal by providing concrete incentives for compliance, particularly for problems that the State likely would not have discovered. The evidentiary protections provided by the self-audit law provide further incentives for companies to evaluate their environmental compliance by removing fears that such documents will be used against them. In that it is designed to improve environmental quality, the limited immunity offered under the self-audit law is unlike immunities that simply allow industries to avoid paying fines for their violations.
Our analysis of the federal delegation requirements and Colorado's self-audit law indicates that the two are entirely consistent. First, the environmental statutes allow states substantial flexibility in carrying out the mandates of the statutes. Second, while those statutes do require states to have general authority to assess penalties for violations, they do not prevent the states from codifying prosecutorial discretion in the form of statutory immunity in limited circumstances.
 1. Congress Intended to Give the States Flexibility and Autonomy in Implementing the Environmental Statutes
The congressional declaration of the policy and goals in the CWA provides a clear example of congressional intent to give state flexibility and primacy in implementing the environmental statutes:
 It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use . . . of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.
33 U.S.C. § 1251(b).
The legislative history of the CWA further indicates that Congress intended the states to have flexibility in administering the clean water program. As that history reflects, "[t]he purpose of certifying the States and providing commensurate resources is to reduce duplication of effort by State and Federal levels of government, a major complaint in the program; [and] to avoid unnecessary enlargement in the number of federal personnel needed for program implementation . . . ." Legislative History of the Clean Water Act of 1977, S. Rep. No. 95-370 (1977), reprintedin 1977 U.S.C.C.A.N. 4326, 4356. Congress further stated that the oversight authority of the EPA is not intended "to supplant State enforcement . . . [but] be available in cases where States and other appropriate enforcement agencies are not acting expeditiously and vigorously to enforce control requirements." Legislative History of the Water Pollution Control Act Amendments of 1972, S. Rep. No. 92-414-(1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3730.[11]
The D.C. Circuit examined the principle of state flexibility in administering the CWA in Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency, 859 F.2d 156 (D.C. Cir. 1988). In that case, the court considered the question of whether the states had to set maximum penalties at the same level that the CWA provided for EPA. In a challenge to EPA regulations setting state maximum penalties lower than federal penalties, the court emphasized the autonomy of the states in carrying out the CWA:
 Uniformity is indeed a recurrent theme in the Act, a direct manifestation of concern that the permit program is standardized to avoid the industrial equivalent of forum shopping and the creation of "pollution havens" by migration of dischargers to areas having lower pollution standards. The desired uniformity, however is spoken of almost exclusively in relation to effluent limitations. Moreover, Congress' quest for homogeneity is in tension with its independent emphasis on state autonomy, which is repeated throughout the legislative history of the Act, is enshrined in the Act as the basic policy to "recognize, preserve, and protect the primary responsibilities and rights of the states," and is the very foundation for the permit program. Congress made even clearer its intent "that the Act be administered in such a manner that the abilities of the states to control, their own permit programs will be developed and strengthened."
Id. at 174.
The EPA itself has acknowledged the requirement to provide states with autonomy and flexibility in enforcement. In 1979, the EPA proposed to consolidate its permit program requirements governing the Hazardous Waste Management Program under RCRA, the Underground Injection Control program under the Safe Drinking Water Act, the NPDES and Section 404 programs under the CWA, and the Prevention of Significant Deterioration program under the CAA. As part of this rulemaking the EPA proposed language which essentially codified its general civil penalty policy at the time. It required states to be able to impose penalties equal to, among other things: (1) an amount appropriate to redress the harm or risk to public health or the environment ("substantial harm"); plus (2) an amount appropriate to remove the economic benefit gained or to be gained from direct compliance ("economic benefit").
On May 19, 1980, EPA finalized this proposed rule with no changes "despite numerous objections that it not be applied to states."[12] Several industry organizations challenged many aspects of the rule, including the penalty provision. The industry organizations argued that this attempt to force states to adopt EPA's civil penalty policy exceeded the mandates of the relevant federal statutes, which require only that states have "adequate authority" to enforce their permit programs.[13]
After lengthy negotiations, EPA and the industry organizations entered into a settlement agreement under which the industry organizations agreed to dismiss their petitions as to the civil penalties issue if EPA dropped the specific civil penalty factors from the rule. See Natural Resources Defense Council, Inc. v.U.S. Environmental Protection Agency, Case No. 80-1607 and Consolidated Cases, "Settlement Agreement on Common Issues and New Discharger Issues," (D.C. Cir. Nov. 11, 1981).
EPA proposed new language on June 14, 1982, that, in its own words "would merely require that any civil penalty . . . be `appropriate to the violation.' Elimination of the remainder of the provision will afford States a greater degree of flexibility in administering their civil enforcement program."[14] The EPA received no objections to this proposal, and it was finalized unchanged on September 1, 1983.[15] This language was codified at 40 C.F.R. § 123.27(c) [CWA]; 40 C.F.R. § 70.11(c) [CAA]; and 40 C.F.R. § 271.16(c) [RCRA].
Thus, legislative language and history and agency practice evidence the need for and intent to give states flexibility in administering environmental programs. Further, EPA has agreed in the Settlement Agreement cited above, and resulting regulations, to give the states that flexibility.
 2. There is Nothing in the Relevant Statutes That Prohibits States From Codifying Prosecutorial Discretion in the Form of Statutory Immunity
The EPA has taken a number of actions that evidence its position that the environmental statutes do not prevent regulators from codifying immunity. In fact, the State's codification of its prosecutorial discretion is very much like EPA's codification of the RCRA "permit shield." EPA's original version of the RCRA permit shield rule provided that EPA "will not take enforcement action against any person who has received a final RCRA permit except for noncompliance with the conditions of that permit." 45 Fed. Reg. 33290, 33428 (May 19, 1980).[16]
Thus, EPA, in rulemaking, provided an amnesty provision for RCRA permit holders; specifically, EPA would not take enforcement action against a permit holder for violations of the underlying statute if the permittee was in compliance with its permit. This is completely analogous to the provisions in the self-audit law providing immunity from fines for disclosure of violations not required to be disclosed under a permit.
The Environmental Defense Fund ("EDF") challenged EPA's promulgation of the permit shield rule, arguing, in part, that the provision unreasonably curtailed EPA's enforcement powers, i.e., that EPA had to have the authority to get a penalty in every instance of non-compliance. See Shell Oil Co. v. U.S.Environmental Protection Agency, 950 F.2d 741, 762 (D.C. Cir 1991). In defense to that challenge, EPA stated that although the rule lacked explicit statutory authorization, it furthered the objectives of the RCRA permit program by protecting permittees from "`unavoidable uncertainty as to the standing of their operations under the law,' . . . and by conserving agency resources, which would be `barely sufficient to issue and renew RCRA permits, and review State permits.'" Id.
The D.C. Circuit upheld EPA's permit shield rule on two grounds. First, the court found that the statutory provision cited by EDF for the proposition that EPA was required to have enforcement authority to bring an action in every instance of non-compliance used the permissive term "may." Second, the court found that regulatory agencies had great discretion in setting their own enforcement agendas, in that they were best able to determine how resources should be used most effectively. The court further explained, "An agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."Id. at 763 (quoting Heckler v. Chaney, 470 U.S. 821 (1985)).
The court noted that EPA's decision involved an "ordering of priorities" regarding enforcement strategy that was "presumptively reasonable." Id. at 764. The court agreed that it was reasonable for EPA to consider the effective use of scarce enforcement resources and the certainty that regulated entities needed to conduct their business affairs in deciding not to take enforcement action in a whole class of cases. See id.
Colorado's self-audit law provides potential for immunity only for those violations that are not required to be reported under a permit or order. As noted previously, many violations under the environmental statutes are required to be reported if a permit is involved. Further, Colorado's self-audit program is based upon the same considerations as EPA's RCRA permit shield, that is, the efficient use of limited resources and the certainty that comes with a statutory codification of discretion.
The most important point here is EPA itself has interpreted the environmental statutes as allowing codification of prosecutorial discretion in the form of immunity from penalties under certain circumstances. The rule long-established in caselaw is that when congressional intent is not clear, an agency's reasonable interpretation of a statute entrusted to its administration is entitled to deference. See Chevron, U.S.A.,Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,842-43 (1984). EPA has approved delegations of environmental programs in numerous states including Michigan, Ohio, Texas, Utah, and Wyoming where state law contains immunity provisions.See Mich. Comp. Laws § 324.14809 (West 1998); Ohio Rev. Code Ann. § 3745.72 (West 1998); Tex. Civ. Stat. Art. 4447cc
§ 10 (West 1998); Utah Code Ann. §§ 19-7-103 to -107 (Michie 1998); Wyo. Stat. Ann. § 35-11-1106 (Michie 1998). For example, after extensive negotiations between EPA and the State of Texas, EPA approved a state program that provided for some statutory immunity from civil and administrative penalties after voluntary disclosures of violations found in audits. See
Letter from Steven A. Herman, Assistant Administrator for Enforcement and Compliance Assurance, EPA (March 19, 1997). The same is true of Michigan, Ohio, Utah, and Wyoming, where negotiations with EPA regarding those states' audit laws resulted in the states maintaining some form of statutory immunity. Thus, the EPA has interpreted the environmental laws as allowing statutory immunity.
The major difference between immunity in Texas, Michigan, Ohio, Utah, and Wyoming and immunity provisions in Colorado is that the former states, at EPA's insistence, eliminated immunity for negligent criminal acts and for civil offenses resulting in substantial harm or economic benefit. By law, however, there is no legal distinction between state authority to grant immunity for civil violations that do not result in substantial harm or economic benefit and those that do result in such; nor between criminal and civil violations. In short, EPA lacks the legal authority to impose exceptions for economic benefit and substantial harm on state grants of immunity.
In assessing a penalty under the CWA, the statute requires consideration of economic benefit and substantial harm, among other factors. Section 1319(d) of the CWA states:
 In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.
33 U.S.C. § 1319(d).
Neither the CWA nor its implementing regulations, however, require that states receive penalties for economic benefit or substantial harm.[17] Therefore, no requirement exists that the section 1319(d) factors must be used in formulaic fashion by EPA or the states when assessing penalties. In Colorado, the State Legislature considered all the necessary factors and made a policy determination that in a narrow set of circumstances compliance is more important than penalties where a company acts in good faith and comes into compliance expeditiously.
Several recent cases have emphasized the rule that EPA may not impose requirements on states for delegation if those requirements are not contained in regulations or statutes. The Fifth Circuit found that EPA was without authority to require Louisiana to consider impacts to endangered species in the state's NPDES permitting program. See American Forest and PaperAss'n v. U.S. Environmental Protection Agency, 137 F.3d 291 (5th Cir. 1998). In that case, the court stated:
 The language of 402(b) is firm: It provides that EPA "shall" approve submitted programs unless they fail to meet one of the nine listed requirements. We interpreted this language as non-discretionary in Save the Bay, Inc. v. EPA, 556 F.2d 1282 (5th Cir. 1977), noting that "[t]he Amendments [to the CWA] set out the full list of requirements a state program must meet . . . . Unless the Administrator of EPA determines that the proposed state program does not meet theses requirements, he must approve the proposal."
Id. at 297 (citing Save the Bay,556 F.2d at 1285 n. 3).
The D.C. Circuit, in Virginia v. U.S. EnvironmentalProtection Agency, 108 F.3d 1397 (D.C. Cir. 1997), considered an appeal of an EPA rule that reduced ozone pollution in the northeastern United States. In the rule, EPA identified certain controls that states impacted by ozone were required to adopt for control of that pollutant. The court held that EPA did not have the authority to dictate to states the methods or controls the states must use to come into compliance with national ambient air quality standards. See id. at 1415. Likewise, EPA cannot dictate to Colorado the enforcement measures the State must use to comply with the mandates of the environmental statutes.
Our conclusion is that Colorado's environmental programs comply with federal requirements through effective authority to abate a wide range of violations through the imposition of civil and criminal penalties, as well as injunctive relief. Colorado's self-audit law simply provides an alternative mechanism for abating violations in extremely limited circumstances — those meeting the detailed requirements for immunity under the audit law. The self-audit law represents a policy determination which is entirely consistent with the principle of state flexibility that Congress intended under the CWA and other federally delegated programs.
 SUMMARY
Colorado's environmental self-audit law is entirely consistent with the federal requirements for delegation of environmental programs to the states. Because the privilege provisions of the self-audit law do not apply to information and documents required to be maintained or made available under any law, those provisions do not diminish the State's authority to secure required records. Further, the immunity provisions of the self-audit law are consistent with EPA's interpretation of delegation requirements as allowing codification of prosecutorial discretion. Therefore, we find that Colorado meets delegation requirements under the Clean Water Act, Clean Air Act, and Resource Conservation and Recovery Act.
Sincerely,
GALE A. NORTON Attorney General
PATRICIA S. BANGERT Director of Legal Policy
[2] On January 29, 1997, the EPA received a petition from several environmental groups requesting the EPA to initiate proceedings to withdraw Colorado's authorization to administer the NPDES program because of the limitations placed on enforcement by Colorado's self-audit law. The EPA wrote the State on July 3, 1997, requesting the Colorado Attorney General and the Colorado Department of Public Health and Environment to provide a response to questions about the effect of the State's self-audit program on its ability to enforce against violations of the CWA. On November 18, 1997, we responded with a legal analysis of the self-audit law, concluding that the law does not hinder the State's enforcement authority. Representatives from this office and EPA met on two occasions in Spring of 1998 to further discuss this issue without reaching a consensus.
[3] We necessarily treat each of these statutes with a broad brush, that is, we examine minimum requirements for major programs within each Act, without looking at all programs under the acts. For example, we will focus on the Title V program under the Clean Air Act, and not the Prevention of Significant Deterioration, New Source, and Hazardous Air Pollutant programs under that statute.
[4] Delegation regulations promulgated by EPA implement these requirements. Of particular importance under the CWA is section 123.26(c), which provides: The State Director and State officers engaged in compliance evaluation shall have authority to enter any site or premises subject to regulation or in which records relevant to program operation are kept in order to copy anyrecords, inspect, monitor or otherwise investigate compliance with the State program including compliance with permit conditions and other program requirements.40 C.F.R. § 123.26(c) (emphasis added).
[5] 42 U.S.C. § 7661a(d) [CAA]; 42 U.S.C. § 6926(b) [RCRA].
[6] See United States v. Chevron, U.S.A., Inc., 1989WL121616 (E.D. Pa. 1989). But see United States v. Dexter Corp.,132 F.R.D. 8 (D. Conn. 1990); Office of Consumer Counsel v.Department of Pub. Util. Control, 665 A.2d 921
(Conn.Super.Ct. 1994) (self-critical analysis privilege does not protect documents from disclosure to government agencies). Also of interest is the fact that several courts have upheld a self-evaluative privilege, if the evaluation is done after the fact. See Reichhold Chems., Inc. v. Textron, Inc.,157 F.R.D. 522 (N.D. Fla. 1994); Bredice v. Doctors Hosp., Inc.,50 F.R.D. 249 (D. D.C. 1970).
[7] There is a legitimate question as to whether EPA's regulations go beyond the authority granted the agency in this area. However, our conclusion in this opinion is not dependent upon resolution of this issue.
[8] Many violations disclosed under the self-audit law result in compliance orders in which both remedial and preventative action is required. For example, since the passage of the self-audit law twenty-five entities have made twenty-eight disclosures and requests for immunity under the law. The CDPHE granted seventeen of these requests in whole, one request in part, and denied five requests. Five requests are still pending. The violations involved the following programs: water (five disclosures), air (fifteen disclosures), and waste (eight disclosures).
Of the disclosures made, many have led to actions that will provide long-term environmental benefits and will enhance compliance. These benefits include: conducting staff training in environmental procedures; modifying company practices that result in violations; and discontinuing certain practices entirely. In addition, disclosures were received from at least nine entities that were not known to the State's regulators because they were operating without certain permits, and were not likely to have been discovered independently by State inspectors. These self-identified entities are now in the system and their compliance can be tracked by regulators. In fact, many of the violations reported would not have been found by regulators under the State's present regulatory scheme, or by company officials, absent a self-evaluation.
Colorado's self-audit law, then, has resulted in positive environmental gains. More could be done, however. There are thousands of permitted facilities in the State, and thus twenty-eight voluntary disclosures constitutes a very low percentage of regulated entities. More persons and entities would likely utilize the provisions of the self-audit law if not for threats by EPA to overfile against entities using the self-audit law or withdraw delegated programs.
[9] Permits issued by the CDPHE's Air Quality Control Division contain similar provisions for reporting of upsets and other forms of non-compliance.
[10] The self-audit law contains the following declaration:
 The general assembly hereby finds and declares that protection of the environment is enhanced by the public's voluntary compliance with environmental laws and that the public will benefit from incentives to identify and remedy environmental compliance issues. It is further declared that the limited expansion of the protection against disclosure will encourage such voluntary compliance and improve environmental quality and that the voluntary provisions of this act will not inhibit the exercise of the regulatory authority by those entrusted with protecting our environment.
§ 13-25-126.5(1), C.R.S. (1998).
[11] The legislative history of the CAA contains similar language:
 The permit program is predicated on the principle that the primary responsibility for its day-to-day administration will rest squarely with state and local pollution control agencies. While EPA has an important role of providing guidance and general oversight, the agency should not unduly interfere with state's implementation of the permit program.
Legislative History of the Clean Air Act Amendments of 1990, S. Print No. 38, 103d Cong. 1st Sess., 1044 (1993). RCRA's legislative history indicates as follows:
 It is the Committee's intention that the States are to have primary enforcement authority and if at any time a State wishes to take over the hazardous waste program it is permitted to do so, provided that the State laws meet the Federal minimum requirements for both administering and enforcing the law.
H.R. Rep. No. 94-1491(I) (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6262.
[12] 45 Fed. Reg. 33290, 33382.
[13] 33 U.S.C. § 1342(b) [NPDES program];42 U.S.C. § 7661a(b)(5) [CAA]; 42 U.S.C. § 6926(b) [RCRA].
[14] 47 Fed. Reg. 25546, 25549.
[15] EPA's current position that states must get penalties for economic benefit and substantial harm raises serious questions as to whether the EPA is violating the federal Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq. The effect of EPA's imposition requiring these penalties is the same as a rulemaking. See 5 U.S.C. § 553.
The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4). Clearly then, EPA's attempt to impose its own penalty policy on the states has the same effect as a rule. However, this approach does not comply with the rulemaking requirements and procedures of the APA. See 5 U.S.C. §§ 551-553. By conditioning approval of state environmental programs on a state's authority to use the abandoned civil penalty factors, EPA is attempting to reinstate its 1979 rule through the back door without utilizing the required rulemaking procedures. It is therefore Colorado's position that EPA is acting illegally by requiring states to obtain civil penalties in circumstances which it has arbitrarily established.
[16] The provision currently reads:
 [C]ompliance with a RCRA permit during its term constitutes compliance, for purposes of enforcement with Subtitle C of RCRA. . . .
40 C.F.R. § 270.4.
[17] See supra note 15 (discussing the impropriety of EPA's attempt to force its own penalty policy on the states without utilizing the rulemaking procedures required by the APA).